SOUTHERN PAC. R. CO. *v.* DULL and others.

*(Circuit Court, D. California. December 15, 1884.)*

1. LAND GRANT TO SOUTHERN PACIFIC RAILROAD COMPANY—ACT OF MARCH 3, 1871—GRANT VESTED, WHEN.

The words "that *there be* and *is hereby granted,*" in the act of congress of March 3, 1871, granting lands to the Southern Pacific Railroad Company of California, constituted a *present* grant that could only be defeated by failure to perform the conditions subsequent, and; upon proper proceedings, to take advantage of the failure to perform them; and the general right to the land, subject to the exceptions found in the act, vested at the date of the passage of the act, March 3, 1871, and attached to the specific lands at the moment of the filing of the plat in the office of the commissioner of the general land-office, as provided by section 3 of the act, on April 3, 1871, and from the latter date it was

not in the power of any officers of the government, by any action of theirs, to divest or in any way limit or modify the vested rights of the company.

**2. SAME—MEXICAN GRANT—FINAL LOCATION—GRANT OF SAME LANDS TO RAILROAD.**

As, under the act of June 14, 1860, the location of a Mexican grant becomes final after the publication by the surveyor general of the notice provided by the act, in the absence of an application to have the plat and survey returned to the district court for examination, and all lands outside of such final survey become public lands, and subject to other disposition, under the laws, the grant, by the act of March 3, 1871, attached to such lands within the exterior limits of the Tajanta grant, but outside the limits thereof, as thus finally located, before the date of the filing of the plat by the company.

**3. SAME—RIGHTS OF SETTLERS—CONVEYANCE BY PATENTEE.**

D. entered upon land within the exterior limits of the Tajanta grant to secure a pre-emption claim, but, supposing that the land was *sub judice*, abandoned it and settled on other land. Four years later, and eighteen months after the filing of the plat required by the act of March 3, 1871, by the Southern Pacific Railroad Company, he returned. *Held,* that he could acquire no title, and that the patent issued to him was void, or in trust for the company, and that he could convey no better title to a purchaser for value without actual notice of the title of the company.

In Equity.

*Joseph D. Redding,* for complainant.

*Barclay & Wilson* and *Estee & Wilson,* for defendants.

SAWYER, J. This is a bill in equity to control the legal title vested in the defendants by virtue of a patent of the United States, and to decree that defendants hold the title in trust for complainant, *or for any other relief in equity to which complainant may be entitled.* The land is within the limits of the grant to complainant of the alternate odd sections of land to aid in the construction of a railroad from the intersection of the Texas Pacific Railroad, on the Colorado river, to connect with San Francisco, California, under the acts of congress of July 27, 1866, §§ 3, 18, (14 St. 294, 299,) and of March 3, 1871, § 23, (16 St. 573.) A topographical map of the country through which this part of the Southern Pacific Railroad was to pass, was duly made by the engineers and adopted by the company, upon which map was delineated the line and route of the road so that its location appeared thereon, with reference as well to the sections of the public lands as to the towns, cities, counties, and rivers in the said region. The map, with the line and route so delineated thereon, certified by the chief engineer, president, and secretary of complainant, and under the corporate seal of the corporation, was, on April 3, 1871, duly filed with the secretary of the interior, who duly accepted it, and on said day transmitted the same to the commissioner of the general land-office, to be filed in that office, and on that day it was filed by the commissioner, in his office, whereby the line of the road was definitely located, and the grant attached to all lands at that time subject to the grant under the said several acts. On April 21, 1871, the commissioner of the general land-office transmitted a copy of said map to the receiver of the land-office at Los Angeles, which map was duly filed in that office on April 29, 1871. The road was afterwards fully completed

by complainant, in accordance with the said acts of congress and subsequent acts amendatory thereof, and extending the time for completing said road, whereby the rights of said complainant become perfected to all the lands within the purview of the grant, as designated by these acts. The land in question is part of an odd section within the limits of the grant. After the completion and acceptance of the road, the complainant, in due form of law, repeatedly applied at the proper land-office for the patent to which it claimed to be entitled, tendering all necessary charges and expenses, but a patent was refused.

On November 25, 1867, defendant Dull, having all the qualifications necessary for the purpose, in good faith entered as a preemptor upon the land in question, with the intention of acquiring the title of the United States. He built a house on the land, and resided there, continuously, from November 15, 1867, till about June 1, 1868, —a little over six months,—when he left the land and located in another place, in consequence of the survey made in the mean time by Hansen, hereinafter mentioned, which included the land in question, within the boundaries of Tajanta *rancho*, as surveyed by him, believing, as he did, that land so situated was not open to pre-emption. In the latter part of 1872 the survey of Hansen was rejected by the government at Washington, as having been made without jurisdiction, and as being void. Thereupon, after such rejection, and a year or more after the filing of the plat as aforesaid by complainant, by which the line of the road was definitely located, Dull returned and again settled on the land, and on April 9, 1874, filed his declaratory statement in the proper land-office. The patent in question was afterwards issued to him on December 30, 1880, upon a settlement, as stated by the secretary of the interior in his opinion, to have been made in the latter part of 1872, being the settlement made on his second entry before referred to.

The survey of Hansen was made under the following circumstances: The Tajanta *rancho* grant, being a Mexican grant of a league of land within larger exterior limits, having been finally confirmed under the act of 1851, a survey of the *rancho*, as confirmed, was made by Deputy Surveyor Hancock, in December, 1858. This survey was approved by the surveyor general, September 17, 1860, after the passage of the act of June 14, 1860, relating to the subject, and it is governed by that act. 12 St. 33. The notice of the survey and filing of the approved plat was published, in all respects, as required by the provisions of that act. The plat and survey were retained in the office of the surveyor general for the time required by the act, and no application for ordering it into court, and no such order having been made, the survey became final, under the provisions of said act, in the latter part of September, 1860, and was afterwards duly transmitted by the surveyor general to the general land-office at Washington. Some time prior to February, 1868, the confirmee of

the grant applied to the surveyor general to set aside the Hancock survey, already become final, and have a new one made, which application was referred to the commissioner of the general land-office for his instructions. The commissioner directed the surveyor general to examine the case, and if he found the matter to be still within the jurisdiction of the surveying department, to have a new survey made. The surveyor general afterwards ordered George Hansen to make a survey, and he thereupon made the survey hereinbefore mentioned, in the month of February, 1868, and forwarded it to the general land-office; but the commissioner and the secretary of the interior decided that it was not within the jurisdiction of the surveyor general to make the survey, on the ground that the Hancock survey of 1858 had become final in 1860 under section 5 of said act of 1860, which provides that "the said plat and survey, *so finally determined by publication,* order, or decree, *as the case may be, shall have the same effect and validity in law as if a patent for the land so surveyed had been issued by the United States.*" The said Hansen survey was rejected as void on that ground. The Hancock survey, which became final under the statute in September, 1860, did not include the land in controversy, but the land was situate within the exterior boundaries of the Tajanta *rancho*, as claimed in the petition for confirmation, and the confirmee continued to claim the land, as being within the grant, until the rejection of the Hansen survey by the secretary of the interior, on the ground stated, on February 21, 1872. In December, 1872, after the rejection of the Hansen survey, on the ground stated, defendant Dull returned to the land, and thenceforth occupied in good faith till the issue of his patent. He filed his declaratory statement in the proper office, April 9, 1874.

Prior to the commencement of this suit defendant Dull conveyed the land in question, and his title, whatever it is, has passed to and become vested in defendant Scheffelin, who, prior to his purchase, caused the county records of the county of Los Angeles, in which the land is situated, to be searched, and the legal title thereto appeared upon said records to be vested in his grantor, free from incumbrances; and said purchase was made by him without any actual knowledge, in fact, of any right, title, interest, or claim of complainant, or any other person, of, in, or to said land, or any part thereof. He purchased the land in good faith, for his own use and benefit, and paid therefor $2,500, which was the full value of the land at that time. The congressional grant to the complainant, relied on, is found in section 23 of the act of March 3, 1871, (16 St. 579,) and is in the following language:

"That, for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, with the same rights, giants, and privileges, and subject to the same limitations, restrictions, and

conditions, as were granted to said Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six."

For the particulars of the grants, it will be seen reference is made to the act of July 27, 1866, incorporating the Atlantic & Pacific Railroad, and making the provisions of that act applicable to complainant. 14 St. 292. Referring to section 18 of that act so made applicable, (Id. 299,) it appears that in consideration of the construction of the connecting railroad, therein provided for, and "to aid in its construction," the Southern Pacific Railroad Company of California, complainant herein, "shall have similar grants of land, subject to all the conditions and limitations herein provided;" that is to say, the same grants, and upon the same terms and conditions, as are prescribed for the Atlantic & Pacific Railroad. Section 3 of the act, (Id. 294,) on substituting the name of the complainant for the Atlantic & Pacific Railroad, provides:

"That there *be,* and *hereby is,* granted to the Southern Pacific Railroad Company of California, * * * for the purpose of aiding in the construction of said railroad, * * * every alternate section of public land, not mineral, designated by odd numbers, * * * whenever, on the line thereof, the United States having full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, *at the time the line of said road is designated by a plat thereof, filed in the office of the commissioner of the general land-office.*"

It is settled by numerous decisions that the words "that *there be,* and *hereby is, granted"* lands, in an act of congress, constitute a *present* grant, that can only be defeated by failure to perform the conditions subsequent, and upon proper proceedings to take advantage of the failure to perform them. The general right to the land, in this instance, subject to the exceptions found in the act, vested at the date of the passage of the act, March 3, 1871, and attached to the specific land at the moment of the filing of the plat in the office of the commissioner of the general land-office, as provided by section 3 of the act already cited. *Southern P. R. Co.* v. *Orton,* 6 Sawy. 198; *Schulenberg* v. *Harriman,* 21 Wall. 60; *Leavenworth, etc., R. Co.* v. *U. S.* 92 U. S. 741; *Railroad Co.* v. *Smith,* 9 Wall. 95; *Ryan* v. *Central P. R. Co.* 5 Sawy. 262, affirmed, 99 U. S. 383; *Central P. R. Co.* v. *Dyer,* 1 Sawy. 641; *Knevals* v. *Hyde,* 20 Alb. Law J. 370; *Van Wyck* v. *Knevals,* 106 U. S. 360; S. C. 1 Sup. Ct. Rep. 336.

In the last case cited the court says:

"The grant is one *in præsenti;* * * * that is, it imports the transfer, subject to the limitations mentioned, of a present interest in the lands designated. The difficulty in immediately giving full operation to it, arises from the fact that the sections designated as granted are incapable of identification until the route of the road is 'definitely fixed.' When that route is thus established, the grant takes effect upon the sections, by relation, as of the date of the act of congress. In that sense, we say that the grant is one *in præsenti.* It cuts off all claims, other than those mentioned, to any portion of the lands, from the date of the act, and *passes the title as fully as though the sections had then been capable of identification.*"

In the same case, the supreme court settles the question, also, as to when the grant becomes specific and definite, by attaching itself to particular odd sections. Says the court:

"When a route is adopted by the company, and a map designating it is filed with the secretary of the interior, and accepted by that officer, the route is established; it is, in the language of the act, 'definitely fixed,' and cannot be the subject of future change, so as to effect the grant, except upon legislative consent. It then becomes the duty of the secretary to withdraw the lands granted from market. But if he should neglect this duty, the neglect would not impair the rights of the company, however prejudicial it might prove to others. Its rights are not made dependent upon the issue of the secretary's order, or upon notice of the withdrawal being given to the local land officers. Congress, which possesses the absolute power of alienation of the public lands, has prescribed the period at which other parties than the grantee named shall have the privilege of acquiring a right to portions of the lands specified, and neither the secretary nor any other officer of the land department can extend the period by requiring something to be done subsequently, and, until done, continuing the right of parties to settle on the lands as previously. Otherwise, it would be in their power, by vexatious or dilatory proceedings, to defeat the act of congress, or at least seriously impair its benefit. Parties learning of the route established—and they would not fail to know it—might, between the filing of the map and the notice to the local land officers, take up the most valuable portions of the lands. Nearness to the proposed road would add to the value of the sections and lead to a general settlement upon them. This view of the law disposes of the claim of the defendant. A map, designating the route of the proposed road, made by the engineers of the company after careful surveys, and adopted by its directors, was filed on the twenty-fifth of March, 1870, with the secretary of the interior, who accepted it, and on the twenty-sixth of that month transmitted it to the commissioner of the general land-office with directions to instruct the proper local officers to withhold from sale, or other disposition, the odd-numbered sections within the limits of twenty miles on each side of the route." 106 U. S. 366; S. C. 1 Sup. Ct. Rep. 338, 339.

So, in this case, the plat, duly approved by the engineers, and adopted by the proper officers of the company, was filed in the office of the commissioner of the general land-office on April 3, 1871, and on that day the title of complainant vested, as to all the odd sections within the prescribed distance, of which the land in question was a part of one, to which, at the time, there was no existing vested right in another, or which was not, at the time, within some other exception of the grant. Thenceforth, it was not in the power of any officers of the government, by any action of theirs, to divest, or in any way limit or modify, the rights of complainant so vested under the act of congress. The title of the complainant having vested on April 3, 1871, it attached to the land in question, unless it is within one of the exceptions found in the act. The ground mainly relied on to bring it within one of these exceptions is that on that day the land in question was within the exterior limits of the Tajanta grant, *sub judice* at the time, and therefore not subject to grant within the rule established by the supreme court in *Newhall* v. *Sanger*, 92 U. S. 761. If the Tajanta grant had been finally located before that date, then it was no longer *sub judice*, and the lands, being outside the limits of

the final survey, were public lands, and subject to grant, and the congressional grant attached, unless the land was within some other exception. This point is settled beyond controversy by the decision of this court, affirmed by the supreme court, in *Ryan* v. *Central P. R. Co.* 5 Sawy. 260, and 99 U. S. 382. The supreme court says in the case, with reference to land selected after the final rejection of the Mexican grant, in lieu of other lands excepted from the grant to the railroad company: "When so selected there was no Mexican or other claim impending over it. It had ceased to be *sub judice*, and was no longer in litigation. It was as much public land as any other part of the national dominion." 99 U. S. 388.

The question, then, is, when did the location of the Tajanta grant become final? We have seen from a statement of the facts that the Hancock survey was made prior to the passage of the act of June 14, 1860, (12 St. 33,) and was approved by the surveyor general, September 17, 1860, after its passage, and that the effect of the proceeding is determined by that act. The publication of notice was duly made, and the survey and plats were retained for inspection in the office of the surveyor general for the term prescribed by the act. No application was made to order it into court, in pursuance of the provisions of the act, and no such order was made. The survey thereby became final under the act, after which it was transmitted to the commissioner of the general land-office. The effect of a survey thus become final is declared, by the explicit, express terms of the statute, in language so clear that it cannot be misunderstood, and that is susceptible of but one construction. It is as follows: "And the said plat and survey, *so finally determined by publication, order, or decree, shall have the same effect and validity* in law *as if a patent for the land so surveyed had been issued by the United States.*" The language is in the alternative, and puts a survey, become final by publication, upon the same footing with one made final by an "order or decree" of the court, and makes it, in express terms, in its legal effect, the equivalent of a patent. This act took away the entire jurisdiction of the commissioner of the land-office, which existed under prior statutes, to revise or reject or confirm surveys of Mexican grants, and transferred it to the courts, where parties interested, not satisfied with a survey, were required to make an application to order it into court; and also made the survey and location final, by default of the parties interested, if no such application should be made. When this survey thus became final under the act, it was *res adjudicata* on the location, and there was no authority or jurisdiction in the land department, or in any other officer of the government, to in any way interfere with it. There remained but the mere ministerial duty of issuing the patent, which would be convenient evidence of title, already fully vested under the statutes by the survey, which had become final under the act, and been made equivalent to a patent. Upon this survey becoming final under the pro-

visions of the act of 1860, the grant ceased to be *sub judice;* and all lands outside of the survey thus made final, became public lands of the United States, and subject to any other disposition under the laws. Nothing can be *sub judice* before a tribunal or officer that has no authority or jurisdiction to adjudge the matter, or to in any way meddle or interfere with it. Any attempt to exercise such authority, or any claim made against action already final, and beyond the reach of further jurisdiction, is simply a nullity. From the moment the location became final the commissioner of the general land-office was *functus officio* as to everything but the ministerial duty of issuing the patent. His jurisdiction and power in all other respects were exhausted, and his further acts were void. The confirmation of a survey under the act of 1860 has often been held to be conclusive. *Bissell* v. *Henshaw*, 1 Sawy. 583, 584; *Treadway* v. *Semple*, 28 Cal. 655; *Wright* v. *Semple*, 32 Cal. 659; *Henshaw* v. *Bissell*, 18 Wall. 268, 269. It is held that the proceeding is in the nature of a proceeding *in rem*, and equally conclusive upon those who fail to appear and contest the location upon a notice published under the act of 1860.

Says the court, in *Bissell* v. *Henshaw*, 1 Sawy. 585: "The proceeding is one somewhat of the nature of a proceeding *in rem* under the statute, in which all parties are bound to intervene and protect their interests. If not, there could be no object in this provision of the act." And the supreme court, in affirming the same case on appeal, said: "By the proceedings thus authorized, the approval of the survey brought before the court had, as against claimants under floating grants, the force and conclusiveness of a judicial determination in a suit *in rem*, and all such claimants were concluded by it. * * * If the defendants, or those under whom they hold, failed to appear and contest the survey, they cannot now be heard in this action to question its correctness." 18 Wall. 268, 269. These were cases where the survey had been ordered into court and notice given, and thereupon the survey had been confirmed by order of court; but the statute makes a survey which becomes final after publication, without application to order it into court, equally final and conclusive. It is still in the nature of a proceeding *in rem*, and all who object to the survey must apply, within the time prescribed by the act, to have it ordered into court for judicial examination, or in default thereof they will in like manner be concluded on the expiration of the time. In this case the survey became final under the act on the expiration of the time, and everybody is concluded. The United States on one side, and the confirmee on the other, were, in fact, parties to the record and to the survey; and as to both the Hancock survey became final, and thereafter the matter ceased to be *sub judice*.

In this case the surveyor general, on the application of the confirmee, was, long subsequently, directed by the department at Washington to examine the record, and, if still within the jurisdiction of the surveying department, to make a new survey; and thereupon a

survey was made by Hansen, nearly *eight years* after the Hancock survey had become final. It will be observed that no survey was ordered unless found to be still within the jurisdiction of the surveyor. But the secretary of the interior—and rightly, I think—rejected this survey by Hansen, on the ground that the Hancock survey had long before become final, and that there was no further jurisdiction over the matter; so that the action of Hansen was not voidable merely, but, necessarily, absolutely void. The then secretary of the interior properly held that the grant ceased to be *sub judice* when the Hancock survey became final, and on that theory he issued a patent to the complainant to an adjoining portion of the same section, of which the land now in question is a part, which patent was in question in *Southern P. R. Co.* v. *Garcia,* hereinafter cited. But his successor held that the grant was *sub judice* during all the time the proceedings under the Hansen survey were pending, although those proceedings were void for want of jurisdiction, and refused a patent to complainant for the *locus in quo,* and granted one to defendant Dull on that ground. Manifestly, the first decision was right and the last wrong. The grant ceased to be *sub judice* at the moment the Hancock survey became final. The same view maintained here was taken by the supreme court of California, reversing the judgment of the court below, in *Southern P. R. Co.* v. *Garcia,* before referred to, which was for a part of the same section, and adjoining the land now in question, and therefore similarly situated. 2 Pac. Rep. 397.

The court, after a full discussion of the question, says:

"The publication and approval of the Hancock survey, in the absence of any application to have it returned into the district court, had the same effect and validity in law as if a patent for the land so surveyed had been issued by the United States. After that, the grant was in *no sense sub judice.* * * * It was the duty of the surveyor general to transmit said survey to the general land-office, and of that office to forthwith issue the patent for the land in accordance with said survey. The grant thereby became segregated from the lands lying outside said survey." Page 398.

Such is the unanimous judgment of the supreme court of California, in bank, with respect to a part of this identical section, situated precisely like the part now in dispute; and I have no doubt of the correctness of the ruling. If these unauthorized and void acts of the claimant, and subordinate officers of the land-office, can continue the grant in a *sub judice* condition after a survey becomes final under the statute, then the same result would follow similar acts years after the issue of a patent upon a confirmed claim, and the lands would never be finally segregated from the public domain.

The only other exception suggested, within which the land in question can fall, is that defendant Dull, at the date of the filing of the plat, had initiated a pre-emption right, which he afterwards, in good faith, followed up till he obtained a patent. But Dull was not living on the land at the time of the filing of the map by complainant. He

had entered in 1867, and erected a house, in good faith, with the intention of securing a pre-emption right, and remained till June, 1868, about six months. The Hansen survey having been made in the mean time, he supposed the Tajanta grant to be still *sub judice*, and that the land was consequently not subject to pre-emption. For that reason he abandoned his land and located elsewhere, and did not return to the land till four years afterwards, after the Hansen survey had been decided to be void for want of jurisdiction by the secretary of the interior. He had not resided on the land for nearly three years when complainant's map was filed. At that time he had no vested right whatever in the land. The right he once initiated was lost by abandonment when he left the land in consequence of the Hansen survey. The fact that he was mistaken as to the legal effect of that proceeding cannot affect the question. That removal was an abandonment, no matter what the reasons were that operated upon his mind and controlled his action. The act of abandonment itself, irrespective of the reasons for it, terminated the right initiated, and not followed up and perfected. His subsequent entry, four years afterwards, and eighteen months subsequent to the filing of complainant's map, did not connect itself with his former residence, and continue or reinstate the right first initiated and afterwards lost by his own voluntary act. The right of complainant having attached, it was now too late to acquire a new right of pre-emption. The secretary of the interior, for the purpose of the patent issued, very properly regards his pre-emption right as based solely on the entry in 1872. The land, then, was not within any exception of the act of congress, and the title vested in complainant upon the filing of its plat, and complainant became entitled to a patent upon the performance of the conditions of the grant, which have all been fully performed.

The only remaining question is whether the defendant Scheffelin is protected as a *bona fide* purchaser for value, without notice of complainant's title; and I think he is not. The grant to complainant was made by a statute of the United States *in præsenti*, which could only be defeated by the failure to perform the conditions subsequent. But those conditions were fully performed, and the title became fully vested under the statutory grant, and only the mere ministerial duty remained, to issue the patent, as evidence of title to the complainant. The complainant became the owner of the land, having all the beneficial interest in it, and I think, also, the legal interest, for a title can pass by statutory grant as well as by patent. There was, at most, left in the United States the naked, dry legal title held in trust for complainant, and a patent to any other party, if effective to pass the legal title at all, would be a violation of that trust. But there was no power in the officers of the United States to execute a patent, under the circumstances of this case, to Dull; and the patent is void on that ground. There is, in this case, no right acquired under re-

cording laws by which a subsequent *bona fide* purchaser may obtain a title by reason of a prior purchaser's failure to record his conveyance. So, also, it is not the case of the acquisition of the legal title by a party having a prior equity, equal to the equity of the complainant, to which the legal title, when acquired, attaches itself; and the cases cited upon that point do not apply. There is no equity in the defendant, other than such as arises out of the transaction itself, by which he acquired the legal title, if, indeed, the legal title can be said to have passed. The grant to complainant was by statute, of which all the world must take notice; and, by virtue of the same statute, it became attached to the particular land, and became specific on the filing of the maps in the offices of the commissioners of the general land-office, which also became a public record, pointed out by the statute itself as the place to go for information as to the specific land to which the grant should become attached. The statute and the map became the official record of the grant, and were open to inspection, and were notice to all the world of the extent of the grant. After the filing of the plat it was only necessary to read the statute and compare it with the map on file, and the record of the public surveys, with reference to which the map was made, to ascertain that the land in question was embraced in the grant. There were no facts *extrinsic* to *or dehors* the record to be ascertained on parol, or other evidence, of which a purchaser from Dull might be innocently ignorant. So, also, the proceedings for the confirmation of the Tajanta grant were public judicial records, which disclosed on their face the fact that the survey of the grant had become final, and ceased to be *sub judice* in 1860, long before the filing of complainant's plat and the issue of the patent in question. The rights of complainant, therefore, were fully disclosed by the statute and public records of the United States, of which everybody is bound in law to take notice, and if the defendant Scheffelin did not, in fact, have actual notice, he had legal notice. He was bound to know these facts so disclosed by the statutes and the public records of the United States. So the officers of the land office were not misled by any false testimony *extrinsic* to *or dehors* the record submitted for their determination as to the rights of the complainant. They acted on a known state of facts, disclosed by their own records, and simply erred in the legal conclusions drawn from those known facts. By that error they overstepped the bounds of their authority in refusing a patent to complainant, and issuing the one in question to Dull. The patent is either absolutely void for want of power to execute it, and does not even pass the legal title, or else the dry legal title passed, subject to the trust in favor of complainant, and it should be conveyed to complainant.

In cases where questions of fact are to be determined by the land-office upon parol or other evidence *extrinsic* to *and dehors* the record, in order to ascertain whether a statutory grant has attached to a par-

ticular piece of land, I am not now prepared to say that such determination of facts would not be conclusive; or, if not, that a *bona fide* purchaser, for a valid consideration from the grantee of the patent, issued upon such a determination of facts, would not be protected. But that is not this case. In *Johnson* v. *Towsley*, 13 Wall. 86, the supreme court says:

"It is fully conceded, that, when those officers [officers of the land-office] decide *controverted questions of fact*, in the absence of fraud or impositions or mistake, their decisions on *those* questions are final. * * * But we are not prepared to concede that when, in the *application* of the facts as found by them, they, by *misconstruction* of the law, take from a party that to which he has acquired a legal right under the sanction of those laws, the courts are without power to give relief."

Again:

"The secretary, or rather the assistant secretary, as appears by the record, rejected Towsley's claim on the sole ground that he had previously filed a declaratory statement of his intention to claim a pre-emption of another tract of land which he had voluntarily abandoned; and it is clear that, but for this construction of the statute on that subject, Towsley would have received the patent which was awarded to Johnson." Id. 87, 88.

This doctrine, that relief may be granted where injury has resulted from a misconstruction of the law applicable to the known facts by the officers of the land department, has been repeatedly affirmed since; as in *Shepley* v. *Cowan*, 91 U. S. 340; *Moore* v. *Robbins*, 96 U. S. 535, 536; and other cases. Now, that is precisely what was done in this case. Upon the known, undisputed, and recognized state of facts disclosed by their own records, the secretary of the interior and commissioner of the land-office erred in their construction of the law applicable to the case, holding that, upon the facts and statutes under which the survey became final, the survey did not become final till the rejection of the Hansen survey in 1872; whereas, under the law, it did become final upon the completion of the publication of notice published of the Hancock survey in 1860; and they erred in further holding that the grant continued to be *sub judice* till 1872, whereas, under the law properly construed, it ceased to be *sub judice* in 1860. But for this error of law, upon the conceded facts, the patent would have been awarded to complainant instead of to Dull. This brings the case exactly within the decisions cited. Besides, the case of *Van Wyck* v. *Knevals*, 106 U. S. 360, S. C. 1 Sup. Ct. Rep. 336, is exactly in point in this case, and settles the question, if it were otherwise doubtful; but it is not. There must be a decree for complainant, as prayed in the bill, with costs; and it is so ordered.