## NELSON BURNHAM V. C. S. STARKEY.

1. UNITED STATES PATENT, *Valid to What Extent.* The patent of the United States, issued the 3d of November, 1873, to the Missouri, Kansas & Texas Railway Company, to certain even-numbered sections of land in Allen county, in this state, is valid, and sufficient to convey all the lands described therein, unless persons claiming particular tracts of these lands can clearly show prior homestead or preëmption settlements thereon before any rights of the railway company attached.

2. HOMESTEAD RIGHT, *When not Acquired.* Where a person, prior to 1867, settled in Allen county, in this state, upon public land subject to homestead entry, but neither made nor offered to make any entry or filing thereon until the land was legally withdrawn from market, under the act of July 26, 1866, granting lands to the state of Kansas to aid in the construction of a southern branch of the Union Pacific railway and telegraph from Fort Riley, Kansas, to Fort Smith, Arkansas — now known as the Missouri, Kansas & Texas Railway — such settler acquired no homestead claim or other equity as against the title conveyed by the government to the railway company on the 3d day of November, 1873, under said act.

3. HOMESTEAD CLAIM, *Concluded by Acts of Applicant.* Where a settler upon public land applies to the local land office to enter the same under the provisions of the homestead act as it existed prior to May 14, 1880, but neither presents nor files the affidavit prescribed by the statute, nor pays nor tenders the fee required in such cases, and the land officers inform him that the land has been withdrawn from market for the benefit of a railroad company, under the act of congress of July 26, 1866, and no appeal is taken by him from the refusal of the local land officers to allow his entry, such action of the applicant, and his failure to appeal, conclude the rights he might otherwise have had at the time.

4. LEGAL TITLE, *Equitable Title Not Overcoming.* The facts in this case show no reason why the alleged equitable claim of a settler upon a particular tract of land now in dispute, patented to the Missouri, Kansas & Texas Railway Company on November 3, 1873, should prevail over the legal title.

*Error from Allen District Court.*

THIS was an action of ejectment, brought on the 30th day of September, 1881, by *Nelson Burnham* against *C. S. Starkey,* to recover possession of the west half of the southeast quarter

of section 26, township 25, range 20 east, in Allen county. The case was tried by the court without a jury. Upon the trial, the following agreed statement of facts was read and filed:

" 1. The land mentioned in plaintiff's petition was patented to the M. K. & T. Railway Company, on the 3d of November, 1873, and was duly recorded in the office of the register of deeds of Allen county in the same year, a copy of which patent is as follows:

" '*United States of America, to all to whom these presents shall come, greeting:* Whereas, by the act of congress approved July 25, 1866, entitled 'An act granting lands to the state of Kansas to aid in the construction of a southern branch of the Union Pacific railway and telegraph from Fort Riley, Kansas, to Fort Smith, Arkansas,' authority is given to the Union Pacific Railway Company, south —— branch, now known as the Missouri, Kansas & Texas Railway Company of Kansas, a corporation existing under the laws of said state, to construct a railroad and telegraph line under certain conditions and stipulations as expressed in said act; and provision is made for granting to the state of Kansas for the use and benefit of said railroad company, every alternate section of land or parts thereof designated by odd numbers, to the extent of five alternate sections per mile on each side of said road and not exceeding in all ten sections per mile. And whereas, it is further enacted that, 'In case it shall appear that the United States have, when the line of said railroad is definitely located, sold any sections or any part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same,' then so much land is set apart to be selected for the purposes aforesaid, nearest to the sections above specified, provided 'that said lands hereby granted as indemnity shall not be selected beyond twenty miles from the line of said road.'

"And whereas, it is further enacted by the third section of the aforesaid act that 'when the governor of the state of Kansas shall certify that any section of ten consecutive miles of said road is completed in a good, substantial and workmanlike manner as a first-class railroad; patents shall issue to said company for the lands thereby granted.'

"And whereas, it is indicated by letter of the secretary of the interior to the commissioner of the general land office, dated July 25, 1870, and map therewith, duly certified by the governor of the state of Kansas, that the said 'Missouri, Kansas & Texas Railroad Company has fully completed and equipped, as required by the act, the said railroad from Junction City to the southern bound of the state of Kansas.'

"And whereas, certain tracts have been selected under the act aforesaid by Isaac T. Goodnow, land commissioner of the Missouri, Kansas & Texas Railroad Company, as shown by his original lists of selections dated August 10, 1872, and certified under date of April 14, 1873, by the register and receiver at Independence, Kansas; the said tracts being described as follows, to wit: south of the base line, and east of the sixth principal meridian, Kansas, twenty-mile limits, Independence district. [Here, among other lands, are the lands described in the petition.] The said tracts as described in the foregoing pages from one to eleven, inclusive, containing the aggregate area of ($81,218\frac{30}{100}$) eighty-one thousand two hundred and eighteen and thirty one-hundredths acres.

"'Now, know ye, that the United States of America, in consideration of the premises and pursuant to the said act of congress, have given and granted, and by these presents do give and grant unto the said Missouri, Kansas & Texas Railway Company, of Kansas, and its assigns, the tracts of land selected as aforesaid and described in the foregoing. Yet excluding all 'mineral lands,' should any such be found to exist in the tracts aforesaid, to have and to hold the said tracts with the appurtenances thereof, unto the said Missouri, Kansas & Texas Railway Company, of Kansas, and its assigns forever.

"'In testimony whereof, I, Ulysses S. Grant, President of the United States, have caused these letters to be made patent, and the seal of the general land office to be hereunto affixed.

"'Given under my hand, at the city of Washington, this 3d day of November, in the year of our Lord one thousand eight hundred and seventy-three, and of the independence of the United States the ninety-eighth. U. S. GRANT.

By the President:

[L. S.]        By S. D. WILLIAMSON, *Secretary*.'

"2. The plaintiff purchased and paid in full for the land described in his petition, in the year 1875."

Thereupon, the plaintiff having rested, the defendant read and filed the following agreed statement of facts:

"1. The defendant Starkey is sixty years of age; he came to the state of Kansas about the 20th of October, 1866, and located upon the land described in the petition, and has resided upon and occupied the same continuously ever since.

"2. At the time he went upon the land it was wild, open, and unimproved prairie; there being only one cabin within two miles, and at that time there were more Indians than whites in the vicinity.

"3. At the time the defendant went upon the land, he did so with the distinct intention of homesteading the same under the homesteading laws of the United States, and the land was at said date government land of the United States, and open to homestead entry.

"4. Immediately upon going upon said land, defendant commenced improving the same, and within the first year after going thereon broke fifteen acres of land, planted an orchard of about one hundred fruit trees, built a house, fenced a pasture of five or six acres, and has ever since continued to improve the land year by year to this time, using and expending all he made on the place to the improvement thereof; and he has now near one hundred acres with large and commodious buildings, and an orchard of about seventeen acres, mostly bearing, and all under fence, and improvements being worth from $2,500 to $3,000.

"5. The withdrawal of the land in controversy was made

April 3, 1867, pursuant to commissioner's letter received on that day, and dated March 19, 1867, which letter appears on pages 59 and 60 of the Twenty-seventh Kansas Report, in the opinion of the court in the case of *Neer v. Williams,* and the same is hereby referred to as a part hereof.

"6. At the time defendant went upon said land, he was and ever since has been the head of a family, and duly competent and qualified to make a valid homestead entry.

"7. At the time the railroad company, through whom plaintiff claims title, appraised this land, the appraisers knew and were informed by defendant that defendant was homesteading the same and had valuable improvements thereon, and the railroad company's agent and appraiser of the land, to wit, Cap Heard, stopped at defendant's house on said land while attending to said duties.

"8. The land in controversy is located in Marmaton township, Allen county, Kansas, being one of the most public cross-roads in south Marmaton township, and the roads passing it being the most traveled roads in the township. Defendant's improvements have been assessed to him, and he has paid taxes thereon."

The plaintiff also introduced certain oral testimony, upon the consideration of which the court made the following additional findings of fact:

"1. Immediately after settling on the land claimed by him, to wit, October 22, 1866, C. S. Starkey went to the government land office at Humboldt, within whose jurisdiction the land was situated, for the purpose of ascertaining from the local land offices if the land was subject to homestead entry, with the *bona fide* intention, if the land was subject to entry, to erect a house upon the land, and to make his permanent residence thereon, and to enter the same the succeeding spring; that Starkey communicated his intention to Watson Stewart, who was then the duly acting register of the land office and attending to the duties thereof; and said Stewart told Starkey in substance to build his house on the land and to live in it, and that he could enter it; that Starkey thereupon went back to the land and continued to reside on it, and make permanent and substantial improvements thereon.

"2. Subsequently, in March, 1867, Starkey went to the land office again for the purpose of making his homestead entry on the land occupied by him, and the register of the land office then told him he could not homestead the land,

assigning as the only reason for his refusal, that the land had been withdrawn from market for the benefit of the Missouri, Kansas & Texas Railway Company, and that it was not homestead land, and that there was no public land in Allen county. He however told Starkey to remain on the land; that it would be outside of the railroad land after they had their quota; thereupon Starkey went back to the land, and has remained ever since upon it, and made the permanent and substantial improvements now on the land.

"3. Ever since October 20, 1866, the defendant Starkey has been in open, actual, visible, and exclusive possession of the land in controversy."

The trial court, upon the agreed statement of facts, and the additional facts found upon the testimony introduced, found and filed its following conclusions of law:

"1. The right of the defendant as a homestead settler attached to the land in controversy October 20, 1866, and has never been waived or abandoned.

"2. The action of the commissioner of the general land office in withdrawing the land from homestead by his letter of March 19, 1867, and the action of the local land officers in refusing to allow the defendant to homestead the land, was without authority of law, and in violation of the rights of the defendant.

"3. The land in controversy was included in the patent to the railroad company without authority of law, and in violation of the defendant's rights, and conveyed no title as against the defendant.

"4. The plaintiff is not entitled to recover in the action."

Subsequently, judgment was rendered against the plaintiff, and in favor of the defendant for costs. The plaintiff excepted, and brings the case here.

*Hutchings & Keplinger*, for plaintiff in error.
*Knight & Foust*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action of ejectment, brought by Nelson Burnham against C. S. Starkey, to recover possession of a tract of land in Allen county. The case was tried

by the court without a jury, and judgment rendered against the plaintiff. The land in dispute was patented to the Missouri, Kansas & Texas Railroad Company on the 3d of November, 1873; this patent was recorded in the office of the register of deeds of Allen county on November 21, 1873. The plaintiff purchased and paid full consideration for the land in 1875. The defendant claims the land under the homestead laws of the United States. He went upon the land on the 20th of October, 1866, and had at that time all the qualifications of a person entitled to enter land under the homestead laws; the land at that time was public land of the United States, subject to homestead entry. Immediately after settling upon the land, the defendant went to the government land office to ascertain whether it was subject to homestead entry, with the intention, if it was lawful for him so to do, to enter the same as a homestead the succeeding spring. The register of the land office informed him he might live and build a house upon the land, and that it was subject to homestead entry; thereupon he went back to the land, and has continued to reside upon it, having made lasting and valuable improvements of the value of two thousand five hundred dollars. When the defendant settled upon the land in the fall of 1866 he had little or no money, and therefore was not able to pay the fees required to enter the land under the homestead laws. In the spring of 1867 he went to the land office again, to enter the land under the homestead laws; the register refused to permit him to make the entry, and informed him the land was not subject to entry, as it had been withdrawn for the benefit of the Missouri, Kansas & Texas Railway Company. The withdrawal of the land was made in pursuance of a letter of the commissioner of the general land office dated March 19, 1867. (*Neer v. Williams*, 27 Kas. 59, 60.) The register told the defendant to remain on the land; that it would be outside of the railroad land, after the road had obtained its quota; thereupon the defendant went back to the land, and has remained upon it ever since. At the time the land was first settled upon it was wild unimproved prairie, and worth about one dollar and

39 — 41 KAS.

twenty-five cents per acre. It is now worth, considering the improvements, from twenty to twenty-five dollars an acre.

In July, 1866, an act was passed by congress granting directly to what is now known as the Missouri, Kansas & Texas Railway Company, lands to aid in building the road from Fort Riley southeasterly and down the Neosho valley to the southern boundary of the state of Kansas. It provided for patents from the government to the railway company. It granted lands in place, and provided for indemnity lands to be selected by the secretary of the interior. In 1885, Brewster, attorney general, for and on behalf of the United States, brought a suit in equity against the Kansas City, Lawrence & Southern Kansas Railway Company, in the United States circuit court for the district of Kansas, to set aside the patent issued to the railway company. In that case, Brewer, J., entered a decree annulling the patent issued by the United States, holding that the Missouri, Kansas & Texas Railway Company had no valid, legal, or equitable claim to the lands conveyed to it from the government under the acts of Congress of 1863 or 1866. (*Brewster v. Rly. Co.*, 25 Fed. Rep. 243.) An appeal from that decree was taken to the United States supreme court, and, by the judgment of that court, the decree of the circuit court was reversed. Mr. Justice Miller, speaking for the supreme court, said:

"That there was no sufficient reason found in the record for setting aside the evidences of title to the lands issued to the railroad corporation, which built the road within the time required by law, to the approval of the officers of the government, whose primary duty it was to certify the lands, and who did so within the scope of their powers." (*Rly. Co. v. Atty. General*, 118 U. S. 682.)

Subsequently, the United States filed its bill against the Missouri, Kansas & Texas Railway Company in the circuit court of the United States for the district of Kansas, to set aside the patent to the even-numbered sections of land patented to the railway company. The patentee and certain grantees from it of various sections were made parties defend-

ant. Brewer, J., sustained a demurrer to the bill, and dis-- missed the suit. In the opinion, he said, among other things, that —

"Some years since the government filed a similar bill to set aside patents to the same patentee for odd-numbered sections. That case on final hearing was submitted to me, and decided in favor of the government. (25 Fed. Rep. 243.) On an ap- peal to the supreme court the judgment of the circuit court was reversed, and the case remanded with instructions to dis- miss the bill. (118 U. S. 682.) The opinion filed in that case by the supreme court is earnestly criticised by the learned counsel for plaintiff, and several pages of their brief are de- voted to this criticism. Although such opinion was different from my own, and resulted in the reversal of my judgment, it does not become me to criticise it in the least. On the other hand, it is my duty as a judge of a subordinate court to loyally accept it in all its parts as a correct interpretation of the law. If it be true as counsel say, that there be errors of fact and of law in it, that court when its attention is called to the matter will undoubtedly make the correction; mean- time it is my duty to follow it both in letter and spirit. . . . The observations of the supreme court admonish me that a patent once issued from the general government is not lightly to be disturbed, and that the perfect title supposed to be conveyed thereby must always be upheld unless it be manifest that there has been in its issue a clear departure from the authority granted. If this be true in respect to a recent patent, much more is it true in reference to a patent so old as this. Parties place faith, and should place faith, in the action of the government, and rely upon the title which its patent conveys; and when as appears in this case many parties have purchased in perfect reliance upon the title of the patent, and many years have passed with it unchallenged, common fair- ness requires that the title thus apparently conveyed should be sustained unless it be very clear that there was a want of authority to issue it. Now generally, I may observe in this case, that the construction of the various acts is not clear. The elaborate briefs prepared by counsel on each side indicate that the matter of construction is a doubtful one. When the officers charged with the primary execution of the duty of construction have discharged that duty and placed a certain construction upon those acts and issued a patent in accordance therewith, and that construction has been accepted unchal-

lenged for a long series of years, then the court may well hesitate before it says that that construction was improper and the patent issued without authority." (*United States v. Railway Co.*, 37 Fed. Rep. 68.)

On account of these various decisions, it is unnecessary to consider further the patent conveying the land to the railway company from which the plaintiff is a purchaser in good faith.

**1. United States patent, valid to what extent.** That patent must be regarded as valid, and sufficient to convey all the lands therein described, unless the facts of this case clearly show that the defendant is entitled to the particular tract in dispute by reason of a homestead settlement thereon before any rights of the railway company attached. (14 U. S. St. at Large, 289; *United States v. Railway Co.*, supra.)

The judgment of the trial court was founded upon the following conclusion of law: "The right of the defendant as a homestead settler attached to the land in controversy on the 20th of October, 1866, and has never been waived or abandoned."

Under the original homestead act, the entry was the initiation of the homestead right, and that right attached only from the date of the entry. This was effected by making an application at the proper land office, filing the affidavit and paying the fee required by § 2290, Revised Statutes of the United States, 420. (*Railroad Co. v. Mecklim*, 23 Kas. 167; Circular Letter of the Department of the Interior, of August 25, 1886; Land Laws, 2 Lester, 261; *Beckner Case*, 6 U. S. Pub. Land Dec. 134.)

The act of May 14, 1880, changed the homestead law in this important feature, by providing that a homestead claim to land could be initiated by settlement. Section 3 of that act reads:

"That any settler who has settled, or who shall hereafter settle, on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States land office, as is now allowed to

settlers under the preëmption laws to put their claims on record, and his right shall relate back to the date of settlement, the same as if he had settled under the preëmption law."

The defendant has made no filing, or attempted to make any filing under the act of May 14, 1880; therefore his rights are to be determined under the homestead act prior to the enlargement or extension of some of its provisions, by the act of May 14, 1880. On the 20th of October, 1866, the date the court decided that the defendant's homestead claim attached to the land in controversy, he had not made nor attempted to make any entry of the land at the local land office; therefore, he had no homestead right at that date, because a homestead settler's right attached prior to May 14, 1880, only from the date of entry. The defendant does not claim that he attempted to make any entry until the spring of 1867. On March 19, 1867, at the date of the withdrawal of the land, the defendant had not made or attempted to make any entry of the land. When the land was subject to homestead entry he was not ready or able to file his affidavit and pay the fee required in such cases; therefore, as the defendant did not enter or offer to enter the land until after it was withdrawn, no homestead right attached. When he went to the land office in the spring of 1867, he was then informed by the new register, Col. Goss, "that the land was withdrawn from the market for the benefit of the Missouri, Kansas & Texas Railway Company;" and when the defendant stated to the new register what Mr. Stewart, the old register, had said, Col. Goss replied "that did not amount to anything, as the old register was out of the office; that the land was out, and the defendant could not homestead it." It is evident from the conversation between the defendant and Col. Goss, that the defendant's second visit to the land office was not only after the issuance of the letter of March 19, 1867, but also after notice of the contents of that letter had been received at the local land office. (*Rly. Co. v. Dunmeyer,* 24 Kas. 725.)

2. Homestead
right, when
not acquired.

The trial court found, as a fact, that the withdrawal of the

land was made April 3, 1867. All of the testimony upon which this finding was based is preserved in the record. The finding is unsupported, as the records of the government land offices show that the land was withdrawn March 19, 1867. The trial court was probably confused by the decision in *Rly. Co. v. Dunmeyer*, supra. In the opinion in that case, it was said that the withdrawal of land under a railroad grant from preëmption, private entry and sale, does not take place until the notice of the commissioner of the general land office of the withdrawal is received by the officers of the local land office. That case was taken up on error to the supreme court of the United States. While the supreme court affirmed the judgment rendered by this court, it also decided, under a statute very similar to the grant in this case, that "the line of definite location of a railroad, which determines the rights of railroad companies to land under land-grant acts of congress, is definitely fixed, within the meaning of those acts, by filing the map of its location with the commissioner of the general land office at Washington." (*Rly. Co. v. Dunmeyer*, 113 U. S. 629.) In the opinion, Mr. Justice Miller, speaking for the court, said:

"For we are of opinion, that under this grant, as under many other grants containing the same words, or words to the same purport, the act which fixes the time of definite location is the act of filing the map or plat of this line in the office of the commissioner of the general land office.

"The necessity of having certainty in the act fixing this time is obvious. Up to that time the right of the company to no definite section or part of section is fixed. Until then many rights to the land along which the road finally runs may attach which will be paramount to that of the company building the road. After this no such rights can attach, because the right of the company becomes by that act vested. It is important, therefore, that this act fixing these rights shall be one which is open to inspection. At the same time it is an act to be done by the company. The company makes its own preliminary and final surveys by its own officers. It selects for itself the precise line on which the road is to be built, and it is by law bound to report its action by filing its map with the commissioner, or rather in his office. The line is then fixed.

The company cannot alter it so as to affect the rights of any other party. Of course, as soon as possible the commissioner ought to send copies of this map to the registers and receivers through whose territory the line runs. But he may delay this, or neglect it for a long time, and parties may assert claims to some of these lands, originating after the company has done its duty — all it can do — by placing in an appropriate place, and among the public records, where the statute says it must place it, this map of definite location, by which the time of the vestiture of their rights is to be determined. We concede then that the filing of the map in the office of the commissioner is the act by which 'the line of the road is definitely fixed' under the statute. (*Van Wyck v. Knevals*, 106 U. S. 360.)"

On April 21, 1876, congress changed the law by enacting that the withdrawal of land under land-grant acts of congress ' was not effectual until the notice of the withdrawal of the lands embraced in the grant was received at the local land office of the district in which the lands were situated. This act, however, was passed after the rights of the defendant were fully determined.

Even, however, if the withdrawal of the land had not been made until April 3, 1867, and not until after the defendant had applied, in March, 1867, at the local land office to enter the same as a homestead, the defendant, by his failure to file or offer to file his affidavit, and to pay or offer to pay the fee required in such cases, and his further failure to appeal from the refusal of the land officer to allow him to enter the land, is forbidden from asserting or maintaining a homestead claim. The refusal of the land officers to allow him to enter the land could not have prevented him from prosecuting his homestead claim, because he had a remedy by appeal, if he had any legal or equitable rights, which would have placed him in privity with the paramount source of title. (*Burling v. Thompson*, 19 Pac. Rep. 429.)

3. Homestead claim, concluded by acts of applicant.

The rulings of the general land office are that a failure to appeal concludes any right a claimant might otherwise have had at the time. (*Brown v. White*, Copp's Pub. Land Laws,

298, 299; *Shuster v. Grady,* id. 314; Zabriskie's Land Laws, 63.)

In this case the patent was issued on the 3d day of November, 1873, and from that time to the commencement of this action the defendant has neither attacked the validity of the patent, nor attempted, since the refusal of the land officers to permit him to make a homestead entry, by appeal or otherwise, to file any homestead affidavit, or pay the fees required upon filing an affidavit, or the issuance of a certificate.   Parties who thus act are not in such privity with the paramount source of title as to authorize them to attack the validity of a patent or to claim a homestead settlement or entry. (*Benson v. N. P. Rld. Co.,* 7 Copp's L. O. 34; *Weber v. Western Pacific,* 6 id. 19.)

4. Legal title, equitable title not overcoming.

A settler who is first in time in the commencement of proceedings for the acquisition of title to land, must follow up the same regularly in order to be deemed first in right. "The officers of the land department are specially designated by law to receive, consider and pass upon proofs presented with respect to settlements upon the public lands, with a view to secure rights of preëmption.   If they err in the construction of the law applicable to any case, or if fraud is practiced upon them, or they themselves are chargeable with fraudulent practices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decisions; but for mere errors of judgment upon the weight of evidence in a contested case before them, the only remedy is by appeal from one officer to another of the department, and perhaps, under special circumstances, to the president.   It may also be, and probably is true that the courts may furnish, in proper cases, relief to a party where new evidence is discovered, which, if possessed and presented at the time, would have changed the action of the land officers; but except in such cases, the ruling of the department on disputed questions of fact made in a contested case must be taken, when that ruling is collaterally assailed, as conclusive." (*Shepley v. Cowan,* 91 U. S. 330–340.)

The declaration of the register that the land would be outside of the railroad limit after the company had its quota, was a mere opinion of the officer; and therefore the statement that the defendant might remain on the land was not binding upon the government, or the railway company. The register was only a special agent of the government, and had no authority or power to dispose of the land otherwise than in accordance with the laws of the United States and regulations of the general land office.

Counsel for the defendant urge that the decision of this case shall be reserved (in the event that the judgment of the district court is to be reversed) until final action is taken by the general land office, under the provisions of the "Anderson bill." We cannot perceive that the interest of the defendant will be materially benefited by a temporary suspension of our judgment, and, in any event, the plaintiff is entitled to a hearing and decision of his case in the usual and ordinary mode prescribed by the statute. The final decision does not rest with us, as this case may be taken upon error to the supreme court of the United States, if the defendant so desires. In that court, on account of its overburdened docket, much delay will occur before this decision can be considered.

The judgment of the district court will be reversed, and the cause remanded with direction to enter judgment upon the agreed statement of facts and the findings of the trial court, in favor of the plaintiff and against the defendant.

CHARLES ENGLEHART v. C. S. STARKEY, No. 4489, involving like questions with the foregoing case, will, upon the authority of that case, also be reversed, and remanded with direction to enter judgment in favor of the plaintiff and against the defendant.

All the Justices concurring.