SOUTHERN PAC. R. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. June 24, 1895.)

No. 193.

1. PUBLIC LANDS—GRANTS TO RAILROADS—ADOPTION OF ROUTE.

By Act July 27, 1866, congress granted lands to the A. & P. R. Co. in aid of the construction of a road from Springfield, Mo., to the Pacific Ocean, and by the same act authorized the S. P. R. Co. to build a road from a point of connection with the A. & P. Road, near the boundary of California, to San Francisco, and made to it a grant similar to that to the A. & P. Co. On March 3, 1871, for the purpose of connecting the T. & P. R. R. with San Francisco, congress authorized the S. P. Co. to build a line of road from Tehachapi Pass, via Los

Angeles, to the T. & P. Road, at or near the Colorado river, "with the same rights, grants, and privileges," etc., as were granted to the S. P. Co. by the act of July 27, 1866. In October, 1869, the A. & P. Co. filed its plat purporting to designate the line of its road from the place where it crosses the Colorado river, near the thirty-fifth parallel, extending westerly over the Tehachapi Pass, and in a northwesterly direction to San Francisco. Upon the objection of the S. P. Co. this route was disapproved by the secretary of the interior, on the ground that the act gave the S. P. Co. the right to build the road into San Francisco, and no lands were reserved on this route. March 9, 1872, the A. & P. Co. filed two maps showing parts of a route from the Colorado river to the Pacific coast and thence to San Francisco, which route was completed by two maps filed in August, 1872. This route was approved by the officers of the government, and lands along it were withdrawn from settlement. *Held* that, although parts of the correspondence between the officers of the A. & P. Co. and the government, subsequently passing in the course of a controversy as to the right of the A. & P. Co. to build its road to San Francisco, and parts of certain official documents, relating to such controversy, appeared to refer to the route filed in 1869, and to insist on that route as the one claimed by the A. & P. Co., the A. & P. Co. had abandoned the route of 1869, and its right to that of 1872 had been recognized, so as to withdraw the lands along that route from the operation of a subsequent grant to the S. P. Co. in aid of another line crossing such lands.

**2. SAME—HOW FIXED.**

The line of a railroad to which a grant of lands has been made is definitely fixed, for the purpose of determining the lands to which the grant applies, by the filing of the map of the route, although no actual survey has been made or the line surveyed has been wrongly located on the map, in consequence of errors in projecting township and section lines over unsurveyed parts of the public domain.

**3. SAME—EFFECT OF FRAUDULENT LOCATION.**

A fraudulent deception of the government in regard to the location of the line of a railroad to which a grant of public lands had been made, would be ground for reconsideration of the approval of the maps filed, or for forfeiture of the land, but, without such action by the government, would give no right in such lands to any other company under a subsequent grant.

Appeal from the Circuit Court of the United States for the Southern District of California.

This was a suit by the United States against the Southern Pacific Railroad Company and others to determine the title to certain lands. The circuit court rendered a decree for the complainant. 62 Fed. 531. Defendants appeal. Affirmed.

Joseph D. Redding, William F. Herrin, and William Singer, Jr., for appellants.

Joseph H. Call, for the United States.

Before GILBERT, Circuit Judge, and KNOWLES and BELLINGER, District Judges.

BELLINGER, District Judge. This is a suit by the United States against the Southern Pacific Railroad Company and its grantees to determine the title to about 700,000 acres of land in Los Angeles and Ventura counties, Cal. These lands are within the limits of a grant by congress to the Atlantic & Pacific Railroad Company, of July 27, 1866, as determined by what the government contends was the line of definite location of route by the company. By the same act the Southern Pacific Railroad Company was authorized to build

a road from a point of connection with the road of the Atlantic & Pacific Company, at or near the boundary line of California, to San Francisco, and, to aid in such construction, was given a similar grant of land to that granted the Atlantic & Pacific Company. On March 3, 1871, for the purpose of connecting the Texas & Pacific Railroad with San Francisco, congress authorized the Southern Pacific Company to construct a line of road from a point at or near Tehachapi Pass, via Los Angeles, to the Texas & Pacific Railroad, at or near the Colorado river, "with the same rights, grants, and privileges," etc., as were granted to said Southern Pacific Company by the act of July 27, 1866. On July 6, 1886, the lands granted to the Atlantic & Pacific Company in California were, by act of congress, forfeited and restored to the public domain. The lands in controversy are within the limits of both grants at the place where the line of the Southern Pacific crosses what is claimed by the government, as above stated, to be that of the Atlantic & Pacific Company; and the question to be decided is as to whether the earlier grant attached to such lands, and thus operated to exclude them from the grant to the Southern Pacific Company. This same question was considered in the supreme court of the United States in two cases by the United States against the Southern Pacific Railroad Company, heard together, and decided in 146 U. S. 570, 13 Sup. Ct. 152. It was contended in these cases that no map of definite location of line between the Colorado river and the Pacific Ocean was ever filed by the Atlantic & Pacific Company. The facts relied upon to maintain this contention were these: The Atlantic & Pacific Company had claimed the right to build its road from the Colorado river to the Pacific Ocean, and thence north to San Francisco. It filed maps in the office of the secretary of the interior of this route, in four sections, at different times in 1872, as will more fully appear hereafter. Taken together, these maps formed a continuous line of route from the Colorado river to San Francisco. This line reached the Pacific Ocean at San Buenaventura, which, however, was not the terminus of any line of definite location, whether shown by one or more of the maps, but was only an intermediate point. It was contended that this was not a valid location (1) because the maps were of segments of route, and were filed at different times; (2) because the maps were filed in the office of the secretary of the interior instead of the general land office; and (3) because the line thus formed extended through San Buenaventura to San Francisco. The court held the location thus made to be good as a definite location from the Colorado river to San Buenaventura; and upon this conclusion as to definite location of line it held that the lands within the limits of the grant to the Atlantic & Pacific Company, as identified by such location, were reserved from the grant to the Southern Pacific Company. In the present case, the validity of this location of line by the Atlantic & Pacific Company is attacked upon the ground that the company, by an earlier and different location of line of route, was precluded from making the location relied upon, and upon the further ground

that the second location was not bona fide, but was a mere fraudulent device intended to impose upon the government, and having that effect. These new objections, and the effect of the former adjudication, are the grounds of controversy in this suit.

On October 25, 1869, the Atlantic & Pacific Company filed with the interior department its plat, purporting to designate the line of its road as located from a point selected by the company for crossing the Colorado river, by the route deemed by the company the most practicable and eligible to the Pacific Ocean. The line of road designated on this plat is from a point on the Colorado river near the thirty-fifth parallel, extending westerly over the Tehachapi Pass, and in a northwesterly direction to San Francisco. This map or plat is in evidence for the first time in this case. It was introduced by the defendants, who claim not to have known of its existence when the former case was heard. The defendants contend that this is a map of definite location of route by the Atlantic & Pacific Company, and that the action of the interior department subsequent to the filing of the maps of 1872, in approving a line of definite location by the company, did not refer to the line of these maps, but to the line designated on this map or plat of 1869. If this is so, the grant of the company is identified by this line, and the lands in dispute are not within it, and are therefore subject to the grant to the Southern Pacific Company. The commissioner of the general land office, in conformity with the decision of the secretary of the interior, to whom the matter had been referred, refused to recognize the claim of the Atlantic & Pacific Company to a reservation of lands upon the route designated on this map of 1869, upon the ground that the company could not take a grant of lands from the Colorado river to San Francisco. From the consideration given to this question subsequently by the interior department, it seems that this refusal was based upon the conclusion that, inasmuch as the act of 1866 authorized the Southern Pacific Railroad Company to build a road from a point of connection with the Atlantic & Pacific near the state boundary line, to San Francisco, the right to build such connection was exclusive in the former company. No other map or plat of definite location was filed by the Atlantic & Pacific Company until the 9th day of March, 1872, when it filed four maps in the office of the secretary of the interior, two of which refer to territory outside of California, and therefore cut no figure in the case. The other two purport to be maps of definite location from San Francisco to San Miguel Mission, and from a point on the west boundary of Los Angeles county to a point in township 7 N., range 7 E. of San Bernardino base and meridian. The lines thus designated do not connect with each other, nor with any other part of the located line. On the 11th of April, 1872, the acting secretary of the interior, in answer to a letter by the president of the Atlantic and Pacific Company, stated that the maps theretofore filed at different dates by the company had been approved. On August 15, 1872, two other maps, purporting to be maps of definite location, were filed by the company. These maps were approved April 16, 1874. By these maps lines are designated from San

Miguel Mission to a point of connection with the line of the second map of March 9, 1872, at the west boundary of Los Angeles county, and from the east end of the same line in township 7 N., range 7 E. of San Bernardino base and meridian, to the Colorado river. The four maps thus filed, taken together, make one continuous line of location from the Colorado river to San Francisco.

It is now contended in behalf of the defendants that the Atlantic & Pacific Company did not abandon its location of 1869 via Tehachapi Pass to San Francisco, but continued to insist upon it, and that it was to this location that the subsequent approvals by the interior department referred. If this is true, the only definitely located line of the Atlantic & Pacific was that via Tehachapi Pass to San Francisco, and to that line the land-grant rights of the company were limited. The facts in support of this contention are these: On April 6, 1872, Francis B. Hayes, president of the Atlantic & Pacific Company, addressed a letter to the secretary of the interior, stating that the company had filed its maps, delineating its route through the Indian Territory, Northern Texas, New Mexico, Arizona, and portions of California, to San Francisco. and requesting the approval of such line and the withdrawal of lands appurtenant to it. The secretary is "especially" requested by this letter to decide "whether the Atlantic & Pacific Company has not the right to construct its road on the line as filed to San Francisco." The acting secretary answered this letter on April 11th, saying that the maps referred to had been examined and approved, and stating as follows: "The route to San Francisco, as delineated on the map filed, appears to me to be sanctioned by the terms of the charter of the company, and there is no doubt of their right to construct the road on that line." On April 15, 1874, the secretary of the interior addressed a letter to the commissioner of the general land office, referring to the above letter of April 11, 1872, and to the decision of the department in favor of the right of the Atlantic & Pacific Company to build its line to San Francisco, and stating that on June 21, 1872, James H. Storrs, counsel for the Southern Pacific, had submitted an appeal from such action by the department, supported by able and elaborate argument, denying the right of the Atlantic & Pacific Company to build their road to San Francisco, and that, in consideration of the arguments so made, he had concluded to take the opinion of the assistant attorney general, and, such opinion being favorable to the right claimed, he had concluded to decline disturbing the action taken pursuant to the letter of April 11, 1872. The opinion of the assistant attorney general referred to in this letter of the secretary of the interior is dated March 16, 1874, and states that he has "considered the question of the right of the Atlantic & Pacific Railroad Company to definitely locate the line of its road from the point where it crosses the Colorado river, near the thirty-fifth parallel of latitude, to San Francisco, by way of Tehachapi Pass, and west of the Coast Range of mountains"; that "the map of definite location was filed in the general land office on the 12th day of March, 1872, and the lands along the route ordered to be withdrawn on the 22d of April, 1872," etc. It is argued that the inquiry in the letter of the president of the At-

lantic & Pacific Company of April 6, 1872, as to the right of his company to construct its road on the line as filed to San Francisco, can only refer to the line of 1869, since there was no other line to San Francisco "filed" at that time, and that, for the same reason, the reference in the letter of the secretary of the interior of April 11, 1872, to "the route to San Francisco, as delineated on the map filed," necessarily means the map of 1869, and that the description in the opinion of the assistant attorney general of the line as definitely located "by way of Tehachapi Pass" makes it certain that the only line under consideration was the line of 1869. It is further shown that, on March 10, 1873, J. B. Henderson, the attorney of the Atlantic & Pacific Company, wrote a letter to the secretary of the interior, protesting against the location of the Southern Pacific Company, stating that "the Atlantic & Pacific Railroad Company has filed its map of general location of its road, from the crossing of the Colorado river, near the thirty-fifth parallel, by way of Tehachapi Pass, and west to the Coast Range of mountains, to San Francisco, in California." Nearly two years later, on January 5, 1885, J. A. Williamson, as attorney for the Atlantic & Pacific Company, wrote a letter to the secretary of the interior, protesting against the appointment of commissioners to approve sections of the Southern Pacific road, in which he maintained that the map of 1869 was a definite location of the road of the Atlantic & Pacific Company through California; that such company adhered to that map, and that its right to particular tracts of land was identified by such location.

From the filing of the map of 1869, the interior department was vexed with controversy over the question of the right of the Atlantic & Pacific Company to build its road to San Francisco. The Southern Pacific was authorized, by the same act under which the Atlantic & Pacific had its grant, to build from a point of connection with the latter company's road on the Colorado river to San Francisco; but, if that company itself built this extension, the Southern Pacific would be practically crowded out of this field. It therefore resisted, before the land department, the pretentions of the Atlantic & Pacific to make San Francisco its coast terminus. It made no difference whether the proposed extension was by the way of Tehachapi Pass or San Buenaventura to San Francisco. It was not a question of routes, but of destination, that caused contention between the rival interests. The letter of the president of the Atlantic & Pacific Company to the secretary of the interior of April 6, 1872, and its answer, had reference to this question. It is true that at the date of this correspondence there was technically no continuous line platted from the Colorado river to San Francisco, other than that by way of Tehachapi Pass. There were maps showing portions of a line that could only be connected by a line of route substantially as now contended for by the government. These maps had been filed a few days before the correspondence took place as maps of definite location, and were approved as such, and are evidence of the intention of the company to build over the lines platted on them. The letter of Francis B. Hayes, president of the Atlantic & Pacific Company, of April 6, 1872, to the

secretary of the interior, requesting to know whether "the line as filed" is approved and orders issued to withdraw the appurtenant land, was referred to the commissioner of the general land office, who answered, on the 11th of April, acknowledging its receipt. In this answer the commissioner says: "The lines of road as filed by the company, with your letter of the 9th ult., indicate the general direction of the line, and show San Francisco as the objective point on the Pacific coast," etc. The letter of the secretary of the 9th ult. here referred to is the letter transmitting the four maps of location, two of which are portions of the line by way of San Buenaventura. The reference to them by the commissioner, in answering the secretary's letter transmitting the Hayes letter of April 6th, identifies them as the maps referred to by Hayes in that letter, and shows that the president of the Atlantic & Pacific Company, in speaking of the line as filed, referred to the line of these maps, and not to the line of 1869. It is immaterial to the particular question of identity of maps that separate portions of a line described on independent maps may not technically answer the description of "the line as filed" contained in the Hayes letter of April 6th. The fact remains that the commissioner to whom this letter was referred understood it to refer to the line described on the separate maps, and proceeded to prepare maps of withdrawal of lands appurtenant to such line. While the opinion of the assistant attorney general mentions Tehachapi Pass, yet it otherwise unmistakably designates the other route. The line by way of Tehachapi Pass does not go west of the Coast Range, as the opinion states. The opinion refers to the maps along which the withdrawal of lands of April 22, 1872, was made. This withdrawal was along the line of what is known as "the second map," being the map of definite location from the western boundary of Los Angeles county to a point in township 7 N., range 7 E. of San Bernardino, the map relied upon by the government in this case. It is evident that the assistant attorney general thought that the San Buenaventura route included Tehachapi Pass. Whether he made this mistake, or the other most improbable one of supposing that the line from the western boundary of Los Angeles county to a point in township 7 N., range 7 E. of San Bernardino, was not where the second map and the diagrams of withdrawal filed nearly two years previously located it, is not material. The identity of this route is established by the maps of location on file, by the record approval of the line thus laid down, and the withdrawal of lands, as shown by the diagrams of such withdrawal, filed in the records of the general and local land offices. And the location thus established and identified is not affected by the fact that an attorney of the Atlantic & Pacific Company, two or three years later, in a proceeding adversary to the Southern Pacific in the interior department, wrote a letter stating that the former company adhered to the map of 1869. If the matter was open to controversy, this letter would be material, and the case might turn upon it, if it was otherwise doubtful; but this is not such a case. The board of directors of the Atlantic & Pacific Company, by formal resolution passed at a meeting held in February, 1872, adopted the route of the second map. Subsequently that map

and the map of route from San Francisco to San Miguel were filed and approved, and the lands in controversy withdrawn from settlement. In August of the same year, other maps of definite location, supplying the absent links of route, were filed. Nearly two years later, urged to action by the insistence of the officers of the company, these maps were approved and additional withdrawals of land made. These facts show conclusively that the Atlantic & Pacific Company did not adhere to the map of 1869. What it did not abandon, but always insisted upon, was the destination of that map; and whatever confusion existed in the department with reference to the two routes is probably due to the fact that the company adhered to the claim of right made by the map of 1869 to make San Francisco its coast terminus. The doubt that was raised as to its right to do this, after the decision by Secretary of the Interior Cox against the company, was sufficient reason for the adoption of the second route. By this route the company was sure of its grant, at least to the coast. Otherwise it was liable to lose all of the grant west of the Colorado river.

The map of 1869, having been finally abandoned by the Atlantic & Pacific Company after the adverse decision by the secretary of the interior, was there a definite location of line of route to the Pacific Ocean at San Buenaventura by which the grant to that company attached to the land in controversy? It is charged against the maps of this route that they are fraudulent pretenses, in this: That the lines represented by them were not surveyed and marked on the ground, and that the affidavits of the chief engineer of the Atlantic & Pacific Company to that effect are false. It is argued that by the words "definitely fix" or "definitely locate," with reference to a railroad route, is necessarily implied that a survey has been made on the ground, and that stakes and stones have been set, which fix on the earth's surface the exact route over which the road will pass. None of the earlier railroad land grants provided for the filing of maps or plats of location of line, either general or definite. Such grants were of lands on either side of the proposed road "not sold, reserved, or otherwise disposed of by the United States," etc., "at the time the line of said road is definitely fixed." The method by which it was to be ascertained that a line had been "definitely fixed" was left to the determination of the land department, which held that a survey and marking upon the ground as a fact notorious and easily observed was necessary to "definitely fix" a line of railroad route; and accordingly the supreme court held, in Railroad Co. v. Fremont Co., 9 Wall. 94, that, until the line of the railroad was definitely fixed on the ground, no title could vest to any particular section on the line of road. The act of 1862, in aid of the Union Pacific Railroad Company, provided for the filing by the company of a map of general route, whereupon the secretary of the interior was required to cause the lands within 15 miles of the designated route to be withdrawn from pre-emption, private entry, and sale. The act of 1864, in aid of the Northern Pacific road, provided for the designation of a general route, and for definitely fixing the line of road, and requiring a map of such

definite location to be filed. The act of July 27, 1866, under consideration, is substantially like that in aid of the Northern Pacific Company. All railroad land-grant acts since 1862 have provided for maps of location of route, since which time it has been uniformly held that the line of railroad route is fixed by the map filed. The thing to be guarded against in these cases is a line which is subject to change at the will of the company. The object of a survey and marking on the ground was to "definitely fix" the line. But it was soon apparent that a survey on the ground did not accomplish this. The attorney general, on February 16, 1857, in a quotation contained in appellant's argument, says:

"A mere survey fixes nothing, either contingently or conclusively, in this respect. It is means of information; it is not location. I go further, and say that 'definitely fix' implies fixed without capacity of change."

In Van Wyck v. Knevals, 106 U. S. 366, 1 Sup. Ct. 336, the court said:

"Until the map is filed with the secretary of the interior the company is at liberty to adopt such a route as it may deem best, after an examination of the ground has disclosed the feasibility and advantages of different lines. But, when a route is adopted by the company, and a map designating it is filed with the secretary of the interior, and accepted by that officer, the route is established. It is in the language of the act definitely fixed, and cannot be the subject of future change, so as to affect the grant, except upon legislative consent."

And in Railroad Co. v. Dunmeyer, 113 U. S. 635, 5 Sup. Ct. 566, the court held that:

"The filing of the map in the office of the commissioner is the act by which the line of road is 'definitely fixed,' under the statute."

Inasmuch as the object of the rule in force prior to 1862 was to secure permanence in the line adopted, there is nothing, so far as the government is concerned, that makes a marking on the ground indispensable, where the more effective means of securing that result is provided for by filing maps of definite route. If a map presupposes a survey, and there is in fact no survey, the map is not on that account invalid. It is for the company to adopt a line satisfactory to itself, by means of its own choice. If it adopts an impracticable route, its own interests are prejudiced, not those of the government, which does not, in any event, part with its title to the granted lands until the company has earned them. Moreover, if the legality of what has been done depends upon a survey, and the fact of such survey, as shown by the maps filed and approved in the land department, can be impeached by the testimony of a witness under any circumstances,—much less where his testimony is given more than 20 years after the events described,—all titles depending upon land grants will be insecure and practically valueless. If the authentic character of these records may be destroyed by the testimony of a witness in any case, the testimony should be of the most conclusive character, to have that effect. This is not such a case. The testimony relied upon to impeach the record showing a survey shows that there was in fact a survey. E. N. Robinson, the engineer referred to in the certificate of the chief engineer of the Atlantic & Pacific Company attached to the maps

of this line, as having made this survey, testifies, in effect, that he made surveys for the company between the Colorado river and coast at San Buenaventura, including one through Soledad Pass, and that he staked the line as he proceeded; that "every hundred feet there was a stake, and sometimes oftener," except in places across the desert, where this was not necessary; and that he made reports to the chief engineer of the company from time to time all along the line. He says, as to these reports, "They contained a general statement of the survey and the progress of the party, and the notes, plattings, etc., so that they would understand exactly what kind of a route we were getting through that country." He also testifies, in effect, that a profile always accompanied these reports, showing the grades of the line, and that he sent other maps showing topography, as well; that the crossings of streams and any defined object were shown on such maps, and that they found the grade very easy all the way, practically, from Ventura, following up the Santa Clara river east through the Soledad Canon, up to what is called the "Summit," and that then they had the whole country before them. From the summit, the route of this survey to the Colorado river is particularly described by the witness. Nevertheless, this witness testifies that the survey made by him was a preliminary one; that the map of route in controversy does not designate any survey made by him; that he had nothing to do with this map, and that the work represented by it was not done under his supervision. The repudiation of the map by this witness, and the fact that the line of the map, when located on the ground, is found to be a wholly impracticable railroad route, is the basis for the defendant's contention that no survey was ever made of the line of definite location contended for by the government. But this difficulty is not a real one. It is evident that the line of the map is out of its proper location in consequence of the fact that the route there designated is identified by lines of survey protracted upon the map, in conformity with a practice that obtains where lines are located in advance of the government survey, and that these protracted lines do not coincide with the actual surveys since made. The result is that the line of route which followed the Santa Clara river appears to cross the congressional townships some distance from where the river actually crosses such townships. The line of the map therefore appears, when located on the ground, to be some distance from the river where the line of actual survey was made. There was neither secrecy nor deception in the representation by the map and certificate of the protracted survey as an actual one. The officers of the land department were not ignorant of the unsurveyed condition of this part of the public domain; and, if they were, the government was not prejudiced. There was, then, in fact, an actual survey of a line of route staked upon the ground. It was the work of two large parties in the field, carried on for some months, and was followed by an expenditure of between twelve and thirteen thousand dollars in grading, excavating, sinking shafts, and exploring in Soledad Pass. All of this tends to show good faith on the part of the company.

Assuming, however, that a survey of the line on the ground is required, and that a fraudulent deception was practiced upon the government by the representation that a survey had been made, this is ground upon which the department might properly reconsider its acceptance and approval of the maps filed; but, until such reconsideration, the status of the lands is fixed by what was done. The approved maps operated to identify these lands as within the grant to the Atlantic & Pacific Company, without reference to the good faith of the company in preparing them. The fact of definite location is settled by the maps; and it is the fact, not the means by which it was procured, that decides the question. So of a patent fraudulently obtained. Such a patent operates to transfer title, notwithstanding the fraud by which it was obtained, and for which an injured party may have a remedy in an appropriate proceeding. Moreover, if there was a fraud practiced, as claimed, it could only be taken advantage of by the government. In Lee v. Johnson, 116 U. S. 48, 6 Sup. Ct. 249, the court says:

"The issue of a patent by the officers of the land department cannot be attacked collaterally, but only by a direct proceeding, instituted by the government, or by parties acting in its name and by its authority. * * * It is only when fraud and imposition have prevented the unsuccessful party in a contest from fully presenting his case, or the officers from fully considering it, that a court will look into the evidence. It is not enough that fraud and imposition have been practiced upon the department, or that false testimony or fraudulent documents have been presented. It must appear that they affected its determination, which, otherwise, would have been in favor of the plaintiff. He must in all cases show that, but for the error or fraud or imposition of which he complains, he would be entitled to the patent. It is not enough to show that it should not have been issued to the patentee. It is for the party whose rights are alleged to have been disregarded that relief is sought, not for the government, which can file its own bill when it desires cancellation of a patent unadvisedly or wrongfully issued."

"A third party cannot take upon himself to enforce conditions attached to the grant, when the government does not complain of their breach. The holder of an invalid title does not strengthen his position by showing how badly the government has been treated with respect to the property." Van Wyck v. Knevals, 106 U. S. 369, 1 Sup. Ct. 336.

The Southern Pacific Company was not injured in any right by the alleged failure of the Atlantic & Pacific Company in its duty, or by that company's want of good faith. If fraud was practiced, it was upon the government. If there was an injury, it was the government that was injured. How, then, can the Southern Pacific Company, to whom there was no obligation or duty, and in whom there was no right in respect to the matters complained of, take advantage of the fraud alleged to have been practiced upon the government? And upon what principle of justice or morals can it expect to make use of a fraud practiced upon the government to make a case for itself against the government? At most, then, the alleged frauds in the maps of definite location constituted a cause of forfeiture, and this gave no right of succession to the Southern Pacific Company to the lands liable to forfeiture. This was decided by the supreme court in U. S. v. Southern Pac. R. Co., 146 U. S. 604, 13 Sup. Ct. 152. In that case it was contended by the company that congress intended by the acts of July 27, 1866, and March

3, 1871, that these lands should pass to some company to aid in the building of a railroad, either the Atlantic & Pacific or the Southern Pacific; that if they were not applied to aid the former company, then the latter company was to be entitled to them; but the court held the contention erroneous. It held, in effect, that the exception out of the grant to the latter company of the lands included in the grant to the Atlantic & Pacific Company was not conditional, but absolute; that, if there was any breach of the conditions of the grant to the Atlantic & Pacific Company, congress might itself take all needful measures to accomplish the building of the road, and to that end use the lands of the grant; and that, if the act of forfeiture had not been passed, the Atlantic & Pacific Company could yet construct its road, and, constructing it, its title to the lands in question would become perfect.

"No one but the grantor can raise the question of a breach of a condition subsequent. Congress, by the act of forfeiture of July 6, 1886, determined what should become of the lands forfeited. It elected that they should be restored to the public domain. The forfeiture was not for the benefit of the Southern Pacific. It was not to enlarge its grant as it stood prior to the act of forfeiture. It had given to the Southern Pacific all that it had agreed to in its original grant; and now, finding that the Atlantic & Pacific was guilty of a breach of a condition subsequent, it elected to enforce a forfeiture for that breach and a forfeiture for its own benefit." U. S. v. Southern Pac. R. Co., supra.

These considerations apply to the contention that if the maps of 1872 are maps of definite location, then there was no preliminary location or designation of general route. Moreover, the provision of the law as to this is intended for the protection of the company. It is stated in Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. 100, to be "to preserve the land for the company to which, in aid of the construction of the road, it is granted," by enabling the government to exclude from sale, entry, or pre-emption, the adjoining odd sections within the limits of the grant, in advance of a definite location of route. But there is no reason why the company may not, without this preliminary designation, make a definite location of its line, if it sees fit to do so. In view of the conclusions reached upon the points decided, the effect of the adjudication had in the case last cited as an estoppel in this case has not been considered. The decree appealed from is affirmed.