VAN WYCK v. KNEVALS.

1. Subject to the exceptions therein mentioned, the act of July 23, 1866, c. 212, granted, for the use and benefit of the St. Joseph and Denver City Railroad Company, the odd-numbered sections of public land within a prescribed distance on each side of the proposed road. The company duly filed in the office of the Secretary of the Interior a map showing the definite location of the line of the road. *Held,* that the grant was *in præsenti,* and attached to those sections as soon as the map was so filed. No valid adverse right or title to any part of them could be acquired by a subsequent settlement or entry.

2. On the failure of the company to complete the work, a forfeiture of the grant, if it resulted therefrom, can be enforced only by the United States through judicial proceedings, or the action of Congress. A third party cannot set it up to validate his title, nor avail himself of the fact that the company, in constructing, deviated from the original line, if the lands which he claims are within the prescribed distance from it and the road as built.

3. After the company had filed with the Secretary of the Interior its map of definite location, a party entered a portion of the sections covered by the grant, and a patent therefor was issued to him by the United States. *Held,* that the patent created a cloud upon the company's right and title, and furnishes ground for equitable relief.

4. *Quære,* Where Congress conferred upon a railway company created by a State authority to construct its road within an organized Territory, can the latter, when admitted into the Union as a State, impose any impediment to the full enjoyment by the company of all the rights resulting from the exercise of that authority.

APPEAL from the Circuit Court of the United States for the District of Nebraska.

The first section of the act of Congress of July 23, 1866, c. 212, is as follows: "That there is hereby granted to the State of Kansas, for the use and benefit of the Saint Joseph and Denver City Railroad Company, the same being a corporation organized under the laws of the State of Kansas, to construct and operate a railroad from Elwood, in Kansas, westwardly *via* Marysville, in the same State, so as to effect a junction with the Union Pacific Railroad, or any branch thereof, not further west than the one hundredth meridian of west longitude, every alternate section of land designated by odd numbers, for ten sections in width on each side of said road to the point of intersection. But in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold any section or any part thereof, granted as aforesaid, or that the right of pre-emption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected for the purpose aforesaid, from the public lands of the United States nearest to tiers of sections above specified, so much land in alternate sections or parts of sections designated by odd numbers as shall be equal to such lands as the United States have sold, reserved, or otherwise appropriated, or to which the rights of pre-emption or homestead settlements have attached as aforesaid; which lands thus indicated by odd numbers and selected by direction of the Secretary of the Interior as aforesaid shall be held by the State of Kansas for the use and purpose aforesaid."

There are several provisos to this section which have no bearing upon the matters involved in this suit.

The third section provides that the lands granted "shall inure to the benefit of said company as follows: When the governor of the State of Kansas shall certify that any section of ten consecutive miles of said road is completed in good, substantial, and workmanlike manner as a first-class railroad, then the Secretary of the Interior shall issue to the said company patents for so many sections of said land hereinbefore granted

as lie opposite to and coterminous with the said completed sections, and when certificates of the governor aforesaid shall be presented to the Secretary of the completion, as aforesaid, of each successive section of ten consecutive miles of said road the said Secretary shall in like manner issue to said company patents for the said sections of said lands as aforesaid for each of said sections of road until said road shall be completed: *Provided*, that if said railroad company or its assigns shall fail to complete at least one section of said road each year from the date of its acceptance of the grant provided for in this act, then its right to the lands for said section so failing of completion shall revert to the government of the United States: *Provided further*, that if said road is not completed within ten years from the date of the acceptance of the grant hereinbefore made, the lands remaining unpatented shall revert to the United States."

The fourth section declares, "that as soon as the said company shall file with the Secretary of the Interior maps of its line designating the route thereof, it shall be the duty of the said Secretary to withdraw from the market the lands granted by this act in such manner as may be best calculated to effect the purposes of this act and subserve the public interest."

The company accepted the act, and filed, March 25, 1870, with the Secretary of the Interior a map of the line of its road which the directors had approved on the 21st of that month. The Secretary sent it to the Commissioner of the General Land-Office with the following letter:—

"DEPARTMENT OF THE INTERIOR,
"WASHINGTON, D. C., March 26, 1870.

"SIR,—I transmit herewith a map of the definite location of the line of road of the Saint Joseph and Denver City Railroad Company from Elwood, in Kansas, *via* Marysville, in said State, to a connection with the Union Pacific Railroad at the southwest corner of section 36, in township 9 north, of range 16 west, in the State of Nebraska.

"You will instruct the proper local officers to withhold from sale or other disposal all odd-numbered sections falling within the limits of twenty miles on each side of the line of road.

"In thus directing the land to be withdrawn conformably to the

fourth section of the act of July 23, 1866, I deem it proper, in order to avoid any misapprehension as to the views of the department, to state that this order is made without prejudice to any existing adverse rights, whether individual or corporate, if such there be, and does not include any lands 'heretofore reserved to the United States by any act of Congress or in any other manner by competent authority for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever.'

"In case of such reservation there is granted to the company only a right of way for one hundred feet on each side of its line of road, subject to the approval of the President of the United States.

"The right of the company to construct its road within the limits of the State of Nebraska may hereafter be the subject of controversy; in that event, nothing contained in this order will preclude the consideration of the question as to such right should it arise in a form to require the action of the department.

"Very respectfully, your ob't servant,

"J. D. Cox, *Secretary.*"

On the 8th of the following month, the Commissioner forwarded to the land-officers at Beatrice, Nebraska, a map showing the line of such location and of the ten and twenty mile limits of the grant. He instructed these officers to withdraw from sale, location, pre-emption, or homestead entry all the odd-numbered sections falling within those limits. His letter was received on the 15th of that month, and the lands supposed to be covered by the grant were then withdrawn. The company built sections of the road from time to time, each in due time completed, and the requisite certificate filed with the Secretary of the Interior. It made a junction with the Burlington and Missouri River Railroad at Hastings, Nebraska, July 15, 1872; but never at any point on the Union Pacific, unless the said Burlington road is a branch thereof. It was constructed substantially on the line delineated on the map, and ran through Thayer and Nuckolls Counties, which are within the district of lands subject to sale at Beatrice. But, at a point about one mile east of the lands in controversy in this suit and about seventy-five miles east of Hastings, it departed from that line; at a point opposite those lands it was built from forty to sixty rods from that line, and from that

point to Hastings it deflected from the line from one to three miles. The lands in dispute are within ten miles of the road as built and of the line delineated on the map. The company, April 1, 1873, filed its articles of incorporation in the office of the Secretary of State of Nebraska, but did not otherwise attempt to comply with the laws of that State in respect of foreign railroad corporations extending their roads into that State. The lands in controversy were entered at the Beatrice land-office, April 13, 1870, by Van Wyck, who received a patent for them, bearing date Nov. 15, 1871.

Knevals, who had acquired from the company all its right to those lands, filed his bill against Van Wyck in the court below, where a decree was rendered declaring that the company, by the construction of its road and the notice given to the Secretary of the Interior, was entitled to a patent to the lands in controversy; that Van Wyck received the patent therefor and the title which it conveyed, in trust for the company and not otherwise, and that at the commencement of the suit he held them in trust for the complainant, to whom it was further decreed that he convey them.

Van Wyck thereupon appealed.

*Mr. E. E. Brown* for the appellant.
*Mr. James M. Woolworth* for the appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

The principal question for determination in this case is, When does the grant made to Kansas by the act of Congress of July 23, 1866, c. 212, for the use and benefit of the St. Joseph and Denver Railroad Company in the construction of a railroad from Elwood in that State, to its junction with the Union Pacific Railroad, or a branch thereof, take effect so as to cut off the right of pre-emption from subsequent settlers on the land? The grant is similar in its main features to numerous other grants of land made by Congress in aid of railroads, and contains the same limitations, or, rather, exceptions to it. It differs from some of the grants in that it is made to the State, and not directly to the company to be benefited. The act of Congress, however, provides, notwithstanding the designation of the State as grantee, that patents for the land shall

be issued directly to the company upon the completion of every ten consecutive miles of the road. The grant is of ten alternate sections, designated by odd numbers, on each side of the proposed road, subject to the condition that if it appear, when the route of the road is " definitely fixed," that the United States have sold any section or a part thereof, or the right of pre-emption or homestead settlement has attached, or the same has been reserved by the United States for any purpose, the Secretary of the Interior shall cause an equal quantity of other lands to be selected from odd sections nearest those designated in lieu of the lands appropriated, which shall be held by the State for the same purpose. The grant is one *in præsenti*, except as its operation is affected by that condition; that is, it imports the transfer, subject to the limitations mentioned, of a present interest in the lands designated. The difficulty in immediately giving full operation to it arises from the fact that the sections designated as granted are incapable of identification until the route of the road is " definitely fixed." When that route is thus established the grant takes effect upon the sections by relation as of the date of the act of Congress. In that sense we say that the grant is one *in præsenti*. It cuts off all claims, other than those mentioned, to any portion of the lands from the date of the act, and passes the title as fully as though the sections had then been capable of identification. Nor is this operation of the grant affected by the fact that patents of the United States are subsequently, upon the certificate of the governor, to be issued by the Secretary of the Interior directly to the company and not to the State. This is only a mode of divesting the State of her trust character and of passing the legal title held by her to the party for whose benefit the grant was made. The legal title under the grant goes to the State, but the equitable right vests in the company. The State cannot dispose of the lands; she simply holds them for the use and benefit of the company, the act of Congress providing how her trust shall be discharged and the legal title be conveyed to the company. The act says that the land granted " shall inure to the benefit of the said company as follows," and then proceeds to declare that when the governor of the State shall certify that a section of the road of ten consecu-

tive miles is completed "in a good, substantial, and permanent manner as a first-class railroad," the Secretary of the Interior shall issue to the company patents for the sections of land granted which lie opposite to and coterminous with the completed road, and that similar patents shall issue upon a like certificate upon the completion of every successive section of ten miles. It matters not, so far as subsequent settlers are concerned, in what manner the title, which has passed out of the United States, is transferred to the company from the State. When the route of the road is "definitely fixed," no parties can subsequently acquire a pre-emption right to any portion of the lands covered by the grant. The right of the State and of the company is thenceforth perfect as against subsequent claimants under the United States.

The inquiry then arises, When is the route of the road to be considered as "definitely fixed" so that the grant attaches to the adjoining sections? The complainant in the court below, who derives his title from the company, contends that the route is definitely fixed, within the meaning of the act of Congress, when the company files with the Secretary of the Interior a map of its lines, approved by its directors, designating the route of the proposed road. On the other hand, the defendant, — the appellant here, — who acquired his interest by a subsequent entry of the lands and a patent therefor, contends that the route cannot be deemed definitely fixed, so that the grant attaches to any particular sections and cuts off the right of entry thereof until the lands are withdrawn from market by order of the Secretary of the Interior, and notice of the order of withdrawal is communicated to the local land-officers in the districts in which the lands are situated.

We are of opinion that the position of the complainant is the correct one. The route must be considered as "definitely fixed" when it has ceased to be the subject of change at the volition of the company. Until the map is filed with the Secretary of the Interior the company is at liberty to adopt such a route as it may deem best, after an examination of the ground has disclosed the feasibility and advantages of different lines. But when a route is adopted by the company and a map designating it is filed with the Secretary of the Interior

and accepted by that officer, the route is established; it is, in the language of the act, "definitely fixed," and cannot be the subject of future change, so as to affect the grant, except upon legislative consent. No further action is required of the company to establish the route. It then becomes the duty of the Secretary to withdraw the lands granted from market. But if he should neglect this duty, the neglect would not impair the rights of the company, however prejudicial it might prove to others. Its rights are not made dependent upon the issue of the Secretary's order, or upon notice of the withdrawal being given to the local land-officers. Congress, which possesses the absolute power of alienation of the public lands, has prescribed the period at which other parties than the grantee named shall have the privilege of acquiring a right to portions of the lands specified, and neither the Secretary nor any other officer of the Land Department can extend the period by requiring something to be done subsequently, and until done, continuing the right of parties to settle on the lands as previously. Otherwise, it would be in their power, by vexatious or dilatory proceedings, to defeat the act of Congress, or at least seriously impair its benefit. Parties learning of the route established — and they would not fail to know it — might, between the filing of the map and the notice to the local land-officers, take up the most valuable portions of the lands. Nearness to the proposed road would add to the value of the sections and lead to a general settlement upon them.

This view of the law disposes of the claim of the defendant. A map designating the route of the proposed road, made by the engineers of the company after careful surveys, and adopted by its directors, was filed on the 25th of March, 1870, with the Secretary of the Interior, who accepted it, and on the 26th of that month transmitted it to the Commissioner of the General Land-Office, with directions to instruct the proper local officers to withhold from sale, or other disposition, the odd-numbered sections within the limits of twenty miles on each side of the route. On the 8th of April following, the Commissioner forwarded a copy of the map to the register and receiver of the land-office at Beatrice, in Nebraska, but it was not received by them until the 15th of that month. On the 13th the

defendant entered at that office the land in question, at private entry, and paid the government price therefor. In November of the following year a patent for it was issued to him. His entry, as thus seen, was after the map had been filed and the route "definitely fixed," and the grant had attached to the adjoining odd sections. It could, therefore, initiate no rights to the land, and the subsequent patent issued upon that entry conferred no valid title to the defendant as against the company or parties claiming under it.

The defendant having failed to establish the validity of his own title, attacks the right of the company to the lands covered by the grant, alleging that the company never completed the construction of the entire road for which the grant was made; that after filing its map with the Secretary of the Interior it changed, for part of the distance, the route of the road, and that it never complied with the conditions of the laws of Nebraska for the extension of its road within the limits of that State.

We do not deem these objections, when considered with the facts on which they are based, as having any force. There is to them a ready and conclusive answer. Assuming that the Burlington and Missouri River Railroad, with which the company's road connected, was not, as averred by the complainant, a branch of the Union Pacific Railroad; and that, therefore, the company's proposed road was not entirely completed, the fact remains that the company constructed a portion of the proposed road, and that portion was accepted as completed in the manner required by the act of Congress. Patents for some of the adjoining sections were accordingly issued to the company, and a right to all of them, not specially reserved by the condition of the grant, vested in it. So far as that portion of the road which was completed and accepted is concerned, the contract of the company was executed, and as to the lands patented, the transaction on the part of the government was closed and the title of the company perfected. The right of the company to the remaining odd-numbered sections adjoining the road completed and accepted, not reserved, is equally clear. If the whole of the proposed road has not been completed, any forfeiture consequent thereon can be asserted only by the grantor, the

United States, through judicial proceedings, or through the action of Congress. *Schulenberg* v. *Harriman*, 21 Wall. 44. A third party cannot take upon himself to enforce conditions attached to the grant when the government does not complain of their breach. The holder of an invalid title does not strengthen his position by showing how badly the government has been treated with respect to the property.

As to the alleged deviation of the road constructed from the route laid down in the map, admitting such to be the fact, the defendant is in no position to complain of it; the lands in controversy are within the required limit, whether that be measured from one line or the other. A deviation of the route without the consent of Congress, so as to take the road beyond the lands granted, might, perhaps, raise the question whether the grant was not abandoned; but no such question is here presented. The deviation within the limits of the granted lands in no way infringed upon any rights of the defendant.

As to the want of compliance with the conditions imposed by the laws of Nebraska, allowing railroad companies organized in other States to extend and build their roads within its limits, it is sufficient to say that when the grant was made to the company Nebraska was a Territory, and it was entirely competent for Congress to confer upon a corporation of any State the right to construct a road within any of the Territories of the United States. The grant of land and a right of way for the construction of a road to a designated point within the Territory was sufficient authority for the company to construct the road to that point. It may be well doubted whether the State subsequently created out of the Territory could put any impediment upon the enjoyment of the right thus conferred. As we said in *Railroad Company* v. *Baldwin*, "it could do so only on the same terms that it could refuse a recognition of its own previously granted right, for in such matters the State would succeed only to the authority of Congress over the Territory." 103 U. S. 426, 428. It does not appear from anything before us that the State has ever attempted to interfere with the road or the company for its delay in filing its articles of incorporation with the Secretary of State, or in complying with other provisions of law. And it hardly need be added that

any such interference would not operate to divest the company of its title to lands granted by the United States.

It follows from what we have said, that when the defendant made his entry of the lands in controversy, and obtained a patent therefor, the title had passed from the United States, and consequently no right could be conferred upon him. Still, the patent gave color of title, and because of its issue the officers of the Land Department have refused to give a patent to the company embracing the lands, holding, as may be inferred, the view for which the defendant contends, that his right to enter them continued until notice of the order of the Secretary directing their withdrawal from market was received by the local land-officers. The existence of the patent, therefore, embarrasses the assertion of the complainant's rights; that is, it prevents him from obtaining a strictly legal title which would enable him to recover possession of the premises by an action at law. The existence of the patent also creates a cloud upon the title of the land. Every instrument purporting by its terms to convey land from the original source of title, however invalid, creates a cloud upon the title, if it require extrinsic evidence to show its invalidity. *Pixley* v. *Huggins*, 15 Cal. 128.

The existence of the patent, therefore, under these circumstances, furnishes ground for equitable relief. That relief, however, should properly be limited to a decree declaring the equity of the complainant, the invalidity of the title of the defendant, and enjoining him from the assertion of any claim to the property under the patent; but inasmuch as no objection is taken to the form of the decree as entered, which requires the defendant to execute a conveyance of the premises to the complainant, and as the execution of such a conveyance, amounting in fact to a release of his claim to the property, will accomplish all that could be legally effected, it is not considered necessary to order a modification of it. The decree is accordingly

*Affirmed.*