Greg KAHRE, Appellant,

v.

Shawna Laneil KAHRE, Appellee.

No. 83706.

Supreme Court of Oklahoma.

Nov. 28, 1995.

As Corrected Nov. 29, 1995.

Rehearing Denied May 22, 1996.

**1356**

Michael Gassaway, Oklahoma City, Oklahoma, Timothy D. McCoy, David Goscha, McCoy Law Firm, Oklahoma City, Oklahoma, for appellant.

Chuck Moss, Oklahoma City, Oklahoma, for appellee.

Phillip J. Tucker, Edmond, Oklahoma, Guardian ad litem for the parties' minor children, B.K., and K.K.

WATT, Justice.

## FACTS AND PROCEDURAL BACKGROUND

This litigation has been long and complex. Consequently, this statement of its facts and procedural background must necessarily deal

only with those matters material to the outcome of the litigation. Because of the volume of what has gone on here, much must be passed over in this opinion to ensure that a clear understanding of the issues is provided. Even so, there is much to tell.[1]

### The First Marriage

Greg Kahre and Shawna Tortolini were married on December 4, 1986, when Greg Kahre was 18 and Shawna Kahre 17. Of that marriage two children were born, a son, B.K., on July 14, 1987, and a daughter, K.K., on November 25, 1988.

### The First Divorce

The divorce and ensuing custody fight, from which this appeal arose, were preceded by an earlier divorce. Greg Kahre sued Shawna Kahre for divorce on December 14, 1988, nineteen days after the birth of their daughter K.K.. On February 10, 1989, the court in the first divorce action granted a divorce to both parties, gave custody of the children to Shawna Kahre, and gave Greg Kahre reasonable rights of visitation.

### The Reconciliation, and Second Divorce

In February, 1990, shortly after the first divorce was granted, the parties resumed living together as husband and wife, and bought a house, but on January 16, 1991 Greg Kahre once again filed for divorce. The second divorce was granted in 1992. The first child custody order entered in the second case, dated January 31, 1991, but not filed until October 19, 1992, gave temporary custody to Greg Kahre, with rights of visitation to Shawna Kahre.[2]

Shawna Kahre's visitation rights were suspended in an order dated October 4, 1991, but not filed until October 19, 1992. Apparently, Shawna Kahre's visitation rights were suspended on the strength of Greg Kahre's

allegation that a clinical psychologist, Richard E. Sternlof, Ph.D., had notified the Oklahoma Department of Human Services of potential sexual abuse of B.K. As the later discussion of Dr. Sternlof's role in this matter reveals, however, Dr. Sternlof's notification of DHS was based solely on what Greg Kahre, and his mother, Jacque Kahre, told him, and was made because it was required by law, not because Dr. Sternlof believed there had been sexual abuse.

### The April 15, 1994 Custody Hearing and April 15, 1994 Custody Order

The trial court granted the parties a divorce on June 16, 1992 but reserved the custody issue for later hearing. The custody hearing was held on April 12, 1994. On April 15, 1994, the trial court granted Shawna Kahre custody of the children, effective June 1, 1994. The trial court directed that Shawna Kahre have periods of visitation with the children between April 15 and June 1, 1994, before obtaining permanent custody on June 1, 1994.

### The Protest Letters and Petition

Within days of the trial court's April 15, 1994 ruling granting custody of the children to Shawna Kahre, the first of some seventy letters and a petition protesting the trial court's decision were filed with the Court Clerk. At least ninety percent of the letters were written on one of three printed forms. All the letters told only Greg Kahre's version of the facts and one was signed by Jacque Kahre.

### Greg Kahre's Violation of the Visitation Order and The May 20, and June 3, 1994 Hearings

Greg Kahre failed to produce the children for either the first or second period of visitation the trial court had ordered on April 15,

---

1. The pleadings, trial court briefs, and transcripts of hearings in the case are over nine-hundred pages long.

2. Shawna Kahre has remarried but for the sake of simplicity and consistency, we will refer to her as Shawna Kahre throughout this opinion.

1994. Shawna Kahre then learned that Jacque Kahre, Greg Kahre's mother, had abducted the children, and refused to return them. Shawna Kahre later reluctantly agreed that Greg Kahre could have a new trial if the children were returned. At a hearing held May 20, 1994, Greg Kahre's attorney, Michael Gassaway, claimed that he did not know where the children were and could get them back only if the trial court agreed that a new trial would be granted. The trial court then tentatively agreed to grant a new trial if the children were returned, but expressed extreme reluctance to approve the plan because it appeared that Shawna Kahre had been coerced into agreeing to it.

During a hearing on June 3, 1994, after the children had ostensibly been returned to Oklahoma City, the trial court denied Greg Kahre's motion for new trial, saying that he had agreed to such a course only to get the children back into the jurisdiction of the court and because "you [Michael Gassaway] continued to push me." The trial court apparently decided that it did not have to stand by the agreement because it had been arrived at through coercion. On the same day Jacque Kahre once again removed the children from the jurisdiction of the court, and secreted them until after this Court stayed the trial court's permanent custody order of April 15, 1994, on September 26, 1994. Following the trial court's refusal to grant Greg Kahre a new trial, Mr. Gassaway engaged in a tirade before television cameras outside Judge Humble's courtroom at the Oklahoma County Courthouse. Mr. Gassaway was convicted of contempt of court and fined for his conduct.

### The Guardian ad Litem

On July 23, 1991, in an order not filed until October 19, 1992, the trial court appointed

Phillip J. Tucker as guardian ad litem of the Kahre children. For reasons unexplained by the record the guardian ad litem was not notified of his appointment until after the custody hearing of April 12, 1994.[3] Judge Humble did not know of the guardian ad litem's appointment either, as the order of appointment was made by Judge Humble's predecessor, Honorable Thornton Wright, Jr. Following his notification of his appointment the guardian ad litem participated fully in this matter.

On February 27, 1995, the trial court ordered that the children not again be removed from the jurisdiction of the court without the court's prior written approval, and that Shawna Kahre have visitation with the children in the presence and under the supervision of the guardian ad litem. The visitation was to be for three hour periods on Saturdays or Sundays, at times to be arranged by the guardian ad litem. In his report and brief, filed with this Court, the guardian ad litem reported that there were three weekend visitations with Shawna Kahre and the children in February, 1995. The guardian ad litem reported that the children were anxious at the start of the visitations, but that once the visitations began, "the children showed no fear nor anxieties about being around and interacting with their mother."

### The Trial Court's March 2, and March 7, 1995 Orders Granting Shawna Kahre Visitation Rights

On March 3, 1995, Greg Kahre's counsel, Timothy McCoy, orally applied for an order from this Court staying an order of the trial court, dated March 2, 1995, granting Shawna Kahre supervised visitation on March 4, 1995, although Greg Kahre's previous counsel, Michael Gassaway, had agreed to the order.[4] We temporarily stayed the trial court's March 2, 1995 order on March 3,

---

**3.** A possible explanation of the parties failure to notify the guardian ad litem of his appointment is the confusion that arose because, on multiple occasions, counsel for both parties withdrew, and new counsel entered appearances. Four sets of counsel have represented each party. In addition, four judges were assigned the case at one time or another.

**4.** Timothy D. McCoy and David J. Goscha replaced Michael Gassaway during the course of this litigation. Mr. Gassaway has since resigned from the Oklahoma Bar.

1995, but withdrew our order and dissolved the stay on March 7, 1995.

On March 7, 1995, the trial court entered another agreed order that, among other things, gave Shawna Kahre supervised visitation of the children on Saturdays, and directed Greg Kahre to "restrict access to children by Jacque Kahre."

*Greg Kahre's Judicial Complaint Against Judge Humble, Motion to Disqualify Judge Humble, Motion to Remove Phillip Tucker as Guardian ad Litem, and Violations of the February 28, 1995 Visitation Order*

On February 28, 1995, Greg Kahre filed a motion to disqualify Judge Humble. Earlier, Greg Kahre had filed a judicial complaint against Judge Humble, that was resolved in Judge Humble's favor. Greg Kahre took the position that because Greg Kahre had filed a judicial complaint, Judge Humble should recuse himself. The Chief Judge, Honorable John Amick, denied Greg Kahre's motion to require Judge Humble to recuse.

Greg Kahre filed a motion on March 1, 1994, to remove Phillip Tucker as guardian ad litem. Greg Kahre relied in part on the fact that the guardian ad litem had not participated in the April 12, 1994 custody hearing, although it is undisputed that the guardian ad litem was not notified of his appointment until April 14, 1994. Greg Kahre's complaint against the guardian ad litem dealt mostly with the details of the guardian ad litem's handling of the children during visitation, although the guardian ad litem's actions appear to have been designed to ensure that the visitations occurred. The trial court denied Greg Kahre's motion to remove Mr. Tucker as guardian ad litem.

Greg Kahre failed to make the children available for visitation by Shawna Kahre on March 9, and March 18, 1995, in violation of the agreed order entered March 7, 1995. Then, on March 27, 1995, the guardian ad litem filed an application for an order requiring the physical presence of the children at a hearing before the trial court. The trial court ordered a hearing to be held on March 30, 1995. The guardian ad litem's application also asked that DHS be given physical custody of the children, and the trial court entered an order to that effect. DHS, however, contended that the trial court, sitting as a divorce court and not as a juvenile court, lacked jurisdiction to enter such an order. Consequently, the parties agreed to, and the trial court entered, the March 7, 1995 order that vacated the order granting custody of the Kahre children to DHS.

*The March 30, 1995 Hearing*

The children were not present at the commencement of the hearing, but Timothy McCoy, Greg Kahre's counsel, said they were in his office. When the trial court learned this fact, it directed Mr. McCoy, and a female Oklahoma City police officer, to bring the children to court. After the children were in court, the trial court granted custody of the children to Shawna Kahre, under the 1989 divorce decree, and further ordered that Greg Kahre would have no visitation rights. The trial court concluded that because the first divorce decree had never been set aside, its custody provisions were still viable. Greg Kahre appealed from this ruling and sought a stay. We have not ruled on Greg Kahre's stay motion, but the conclusions we reach in this opinion render it moot.

## ISSUES

I. Was the trial court's decision to grant custody of the Kahre children to Shawna Kahre against the clear weight of the evidence?

II. Did the trial court err in admitting in evidence Dr. Sternlof's report?

III. Did the trial court commit reversible error in holding that the child custody provisions of the 1989 divorce were still viable following the parties' reconciliation in 1990?

We find that the trial court's decision is supported by the evidence, and hold that the

trial court did not err in admitting Dr. Sternlof's report. We also hold that the trial court erred in declaring the child custody provisions of the 1989 divorce still viable following the parties' reconciliation in 1990, but the error was harmless.

## DISCUSSION

## I.

### A. The Record

 The only basis upon which we could hold that the trial court erred in awarding custody of the children to Shawna Kahre would be that the trial court was not entitled to reject the conclusions drawn by Cecilia Owens–Beckham, a clinical social worker, who worked with the Kahre children, and concluded that they had been sexually abused. This we may not do. Custody contests are equity matters and the trial court's ruling will not be disturbed unless it is against the clear weight of the evidence. "The trial court is entitled to choose which testimony to believe as the judge has the advantage over this Court in observing the behavior and demeanor of the witnesses." *Mueggenborg v. Walling*, 836 P.2d 112, 114 (Okla.1992). As the following analysis of the record demonstrates, there was evidence to support the trial court's ruling that Shawna Kahre should have custody instead of Greg Kahre. Implicit in this ruling, of course, was the trial court's determination that Shawna Kahre had not sexually abused her children.

### *Richard E. Sternlof, Ph.D.*

Greg Kahre and his mother, Jacque Kahre, consulted Richard E. Sternlof Ph.D., a clinical psychologist, on December 19, 1990, before Greg Kahre and Shawna Kahre separated. Dr. Sternlof prepared a report in April, 1991. Greg Kahre told Dr. Sternlof that he was considering leaving Shawna Kahre, was concerned about their three-and-one-half year old son, B.K., and wanted Dr. Sternlof to evaluate the child. When Dr. Sternlof asked Greg Kahre what he wanted to accomplish with the evaluation, Greg Kahre told the doctor that he wanted out of the marriage and wanted custody of the children. On January 15, 1991 Greg Kahre and his mother again saw Dr. Sternlof, who told them that it would be very important for Shawna Kahre to be involved in B.K.'s psychological evaluation. Later that day Dr. Sternlof saw Shawna Kahre for ninety minutes.

Greg Kahre told Dr. Sternlof that B.K. had recently been exposing himself, saying he wanted to pretend he was a baby girl. At one time B.K. had grabbed his penis, saying "I want to hurt this." According to Greg Kahre, Jacque Kahre had discussed B.K.'s conduct with her own psychological counselor, who told Jacque Kahre that B.K.'s behavior indicated that B.K. "might have been sexually abused." Jacque Kahre gave drawings to Dr. Sternlof that she said B.K. had made, which might indicate abuse. Nevertheless, Greg Kahre told Dr. Sternlof that neither he nor his mother had notified DHS that B.K. might have been sexually abused. Dr. Sternlof notified DHS, based on what Greg Kahre and Jacque Kahre had told him, because "such an action is required by Oklahoma law."

After interviewing Shawna Kahre once, and Greg Kahre, Jacque Kahre, and B.K., on several occasions, Dr. Sternlof found "no hard data suggesting sexual or physical abuse." Further, Dr. Sternlof observed that B.K. "has many negative feelings toward his father and none towards his mother." Finally, Dr. Sternlof concluded that the results of his evaluation of B.K. "are inconsistent with the allegations of abuse against the mother unless [B.K.] was trying to 'protect her.'"

### *Cecilia Owens–Beckham, A.C.S.W., L.S.W., B.C.D.*

For reasons unexplained by the record, Greg Kahre and Jacque Kahre did not continue B.K.'s treatment with Dr. Sternlof, but sought another counselor for B.K.. After apparently considering several counselors, Greg Kahre and Jacque Kahre selected Ceci-

lia Owens–Beckham, A.C.S.W., L.S.W., B.C.D., who, according to her testimony and report, first saw B.K. on March 1, 1991. Ms. Owens–Beckham, a licensed clinical social worker, had twice-weekly sessions with both B.K. and his sister, K.K.. By the date of the custody hearing in this matter on April 12, 1994, Ms. Owens–Beckham had seen the children 135 times. Ms. Owens–Beckham testified that she had forty hours of videotape of her sessions with the children. When Ms. Owens–Beckham first saw the children, B.K. was three and one-half years old, and K.K. was two years and three months of age.

Ms. Owens–Beckham said that in her early sessions with B.K., although B.K. "denied being abused, his behavior made me suspicious." As late as May, 1991, after Ms. Owens–Beckham had been working with B.K. for more than three months, B.K. had not yet described any sexual abuse. In a report to DHS written in May, 1991, Ms. Owens–Beckham wrote, "I believe that [B.K.] is still too frightened—possibly due to threats that have been made—to disclose what has happened to him." At that time, B.K. had not seen Shawna Kahre since February 17, 1991, and had not lived with her since January of that year.

The longer Ms. Owens–Beckham worked with the children the more bizarre became their stories. In fact, not until after Ms. Owens–Beckham had worked with them for several months, did the children say that they had been abused by their mother. As time went on, the children added that there were others involved, who wore robes and costumes, and used a "blood machine" that removed blood from animals, and that the children were put in cages. Ms. Owens–Beckham added that the children said they had been threatened with death if they revealed the group's activities. Ms. Owens–Beckham said B.K. once told her he feared that his mother would send a tornado into Ms. Owens–Beckham's office and kill them.

In her report of June 12, 1992, Ms. Owens–Beckham wrote that she saw "a picture consistent with ritual abuse." By the time she testified, on April 12, 1994, Ms. Owens–Beckham flatly said that she believed the children had been sexually abused.

The guardian ad litem interviewed Ms. Owens–Beckham at length after the hearing, and asked to see her records. Although Ms. Owens–Beckham testified at the hearing that she had forty hours of videotape of her 135 sessions with the children, she refused to allow the guardian ad litem to review either her videotapes or therapy notes.

### Psychological Evaluations of Shawna Kahre

Kenneth W. Hadley, Ph.D., a psychological technician, and Larry W. McCauley, Ed.D., a psychologist, evaluated Shawna Kahre on December 16, 1991. Drs. Hadley and McCauley concluded in their report that Shawna Kahre "projects a relatively stable personality with frustrations and anxiety present as well [which are] ... most likely due to the ongoing custody problems in which she is presently dealing."

Ms. Owens–Beckham thought that Shawna Kahre might be suffering from multiple personality disorder and suggested that she be seen by a mental health professional with expertise in hypnotism. Ms. Owens–Beckham recommended several counselors, one of whom was R. Vernon Enlow, Ph.D., a clinical psychologist. In late 1992, Shawna Kahre saw Dr. Enlow, who evaluated her under hypnosis on three occasions. Dr. Enlow prepared a report of his findings in which he stated that Shawna Kahre "shows no signs of being connected with any occult activity and is unaware of the meanings for common words and symbols that people interested in meta-physics or occultism would readily know." Dr. Enlow added, "I have not found any unusual or pathological symptoms in Shawna Kahre. She appears to be a normally adjusted young woman...."

### B. The Guardian Ad Litem

The guardian ad litem's role in this matter was important and unusual. To achieve a

full understanding of the issues, it will be useful to explore what it is he was obliged to do, and what he did in this case.

### The Guardian ad Litem's Role as an Arm of the Court

The guardian ad litem was appointed under 43 O.S.1991 §§ 109 and 112.A.1, which require that in a divorce action, the trial court "shall consider what appears to be in the best interests of the physical and mental and moral welfare of the child," (§ 109), and "shall make provision for guardianship, custody, medical care, support and education of the minor children." (§ 112.A.1). A guardian ad litem "becomes an officer of the court and is charged with the duty of protecting the rights of the infant for the State in its role of parens patriae." *Hoffman v. Morgan,* 206 Okla. 567, 245 P.2d 67, 69, 30 A.L.R.2d 1141 (1952). Here, the guardian ad litem, and the trial court, had the express duty to provide for the best interests of the Kahre children. "In awarding the custody of a minor unmarried child or in appointing a general guardian for a child, the court shall consider what appears to be in the best interests of the physical and mental and moral welfare of the child." 43 O.S.1991 § 109.A.

We have not previously considered the duties of guardians ad litem in custody disputes. In recent years many cases from other jurisdictions and commentators have examined the role of the guardian ad litem in custody disputes. Although the issue in most was whether a guardian ad litem was immune from suit by one of the parties over his handling of the guardianship, these cases are of interest here because they examine in detail the duties imposed on guardians ad litem in custody cases. For a collection of many of these opinions see *Collins v. Tabet,* 111 N.M. 391, 397, 806 P.2d, 40, 46, 14 A.L.R.5th 1094 (1991). See particularly *Myers v. Morris,* 810 F.2d 1437, 1466–67 (8th Cir.1987) (guardian ad litem of children investigating sexual abuse allegations performed "delegated functions."); and *Short v. Short,* 730 F.Supp. 1037 (D.Colo.1990) (in custody dispute guardian ad litem acted as the "agent of the court.")

In custody matters the guardian ad litem has almost universally been seen as owing his primary duty to the court that appointed him, not strictly to the child client. *State ex rel. Bird v. Weinstock,* 864 S.W.2d 376, 384 (Mo.App.1993). See also Elrod, *Counsel for the Child in Custody Disputes: The Time is Now,* 26 Fam.L.Q. 53, 59–62 (1992), in which the author observes that the guardian ad litem fills a void for the court. Without the guardian ad litem, the trial court has no practical means to ensure that it receives the information it needs to secure the best interests of the child are served until after the information has been filtered through the adversarial attitudes of the warring parents. The guardian ad litem makes his own investigation as the trial court's agent. The wishes of the minor child are one factor to be considered, but the guardian ad litem's obligation remains the same as that of the trial court: the child's best interests, although the child's wishes may be otherwise.

We concur with the analysis of a guardian ad litem's duties set forth in the cases discussed above. The guardian ad litem in a custody dispute is an arm of the court and must see to the best interests of the child. What the minor child's own wishes may be, particularly a very young child, is only one factor to be considered by both the guardian ad litem and the court.

### The Guardian ad Litem's Investigation

As noted, the guardian ad litem was not notified of his appointment until after the custody hearing of April 12, 1994. After he received notice of his appointment the guardian ad litem conducted an independent investigation consisting of the following:

- Interview with Greg Kahre
- Interview with Shawna Kahre
- Four hour interview with Ms. Owens–Beckham
- Interview with Dr. Sternlof
- Interviews with Mary Tindell and Sue Nelson, who provided child care for B.K. in 1989 and 1990

- Interviews with DHS and Oklahoma City Police investigators concerning their investigations of child abuse against Shawna Kahre.

- Review of trial court record and exhibits, including all psychological evaluations of Shawna Kahre and the children.

- Observation of the children with their mother during three supervised visitations

Because Ms. Owens–Beckham refused to allow the guardian ad litem to review her videotapes and notes, the guardian ad litem asks in his report to this Court: "What did [Ms. Owens–Beckham] have to hide? The videotapes were the only evidence of the objectiveness of the counseling sessions. Were the children being led? After 135 sessions did these children finally begin to believe what they had to say to please their counselor and grandmother?"

The guardian ad litem believes that "the children are not sufficiently mature to form a meaningful opinion as to what is in their best interests." Consequently, the guardian ad litem urges us to affirm the trial court's decision to place custody of the children with their mother, Shawna Kahre.

*The Controversy Over the Reliability of Expert Testimony that Sexual Abuse Has, or May Have, Occurred and the Attitude of the Courts Toward Such Testimony*

In order to assess fairly whether the trial court's decision to disregard Ms. Owens–Beckham's opinion was reasonable, we will look at how such opinions have been regarded by other courts. In recent years controversy has swirled around whether clinical social workers, and other mental health counselors, should be allowed to testify that young children they are treating have, in their opinion, been sexually abused. In the case at bar we need not concern ourselves with the admissibility of such testimony, as the trial court admitted it, but chose to disregard it. Nonetheless, an examination of the conclusions of the courts and commentators

who have dealt with the issue is useful to our inquiry here, as it aids us in assessing whether Greg Kahre was unreasonably prejudiced by the trial court's decision to disregard Ms. Owens–Beckham's testimony.

In *State v. Wright*, 116 Idaho 382, 386, 775 P.2d 1224, 1228 (1989), aff'd. *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), an appeal of a child abuse conviction, the Idaho Supreme Court noted the opinions of many experts that children below the age of five years may lack the ability to distinguish between the memory of a genuine event and the memory of something they imagined happening. "Once this tainting of memory has occurred the problem is irremediable. *That memory is, from then on, as real to the child as any other*." [Emphasis added.] *Id.* The chilling possibility that a child may be remembering fantasy, not fact, has caused many courts to require satisfactory proof that the child was not improperly led into making accusations of sexual abuse, such as videotapes of the counseling sessions, before allowing the admission of such testimony. For an expression of these concerns see *State v. Michaels*, 264 N.J.Super. 579, 625 A.2d 489 (1993), aff'd. 136 N.J. 299, 642 A.2d 1372.

The concerns about expert testimony that sexual abuse has occurred has not been limited to the criminal arena. Two recent civil cases have rejected such proof, too. *Gier By and Through Gier v. Educational Service Unit No. 16*, 845 F.Supp. 1342 (D.Neb.1994), was a civil damage suit brought against a state-established school on behalf of mentally retarded students for alleged sexual, physical, and emotional abuse. The court held that child abuse cannot be proved solely by the child's allegations, and granted a pretrial motion in limine excluding from trial any testimony of experts that the plaintiffs had been abused, or that the children's conduct was consistent with abuse. The *Gier* court was particularly concerned with the psychological evaluation of a seven year old boy who functioned at the level of a four year old. The court observed that writers in the child mental health field have warned of the poten-

tial for unreliability of such testimony: "[A child aged three to five] frequently lacks the verbal and conceptual skills required for investigative interviewing to have validity." 845 F.Supp. at 1346, quoting from Sgori, Porter & Blick, *Validation of Child Sexual Abuse* in *Handbook of Clinical Intervention in Child Sexual Abuse* (S. Sgori ed. 1982). The psychologist in *Gier* used dolls and interpreted the children's drawings in her counseling sessions, as Ms. Owens–Beckham did in the case at bar. The *Gier* court, quoting from *State v. Cressey*, 137 N.H. 402, 628 A.2d 696, 700 (1993), said it agreed with the concern that "the evaluations of the children deal almost exclusively in vague psychological profiles." 845 F.Supp. at 1348. The problem with this, said the court, again quoting from *Cressey*, is that "in such a case the expert's conclusions are as impenetrable as they are unverifiable." *Id.*

*In re Gina D.*, 138 N.H. 697, 645 A.2d 61 (1994), was a child abuse proceeding, begun by a mother while she and her husband were going through a divorce. The child abuse proceeding was a civil matter. The mother's claim of child abuse of a child less than three years old was based on the opinion of a child and adolescent therapist that the child had been abused. The guardian ad litem in the case reported to the trial court that he could find nothing to substantiate the therapist's opinion that the child had been sexually abused. The guardian ad litem further reported that the child's mother made a variety of "wild and exaggerated allegations" about the father and his family, and that he was concerned about the way the mother had handled the divorce so that "events seem to coincidentally fit into an abuse-and-neglect case for some benefit at the divorce court level." 645 A.2d at 66. The trial court admitted the therapist's testimony and relied on it in finding that the husband had abused the child. The New Hampshire Supreme Court reversed, holding that under *Cressey*, 137 N.H. 402, 628 A.2d 696 (1993), the trial court had committed reversible error in admitting the therapist's testimony and relying on it. The New Hampshire Supreme Court

concluded that because the trial court could not "determine and assess the bases for the expert's opinion, it also cannot accord the proper weight, if any, to [be given] the testimony." Thus, the court held the expert's opinion that the child had been abused by her father "was not relevant, and the trial court erred as a matter of law" in admitting and relying on it. 645 A.2d at 65.

A growing body of scholarly writing has concluded that young children are highly susceptible to influence through coercive questioning, and that small psychological rewards will prompt children to lie about events. Other scholars suggest that increasing media coverage of sexual abuse allegations tends to make child health care professionals more likely to suspect sexual abuse as the cause of symptoms in the child. For a discussion of the literature in this area see *State v. Michaels*, 264 N.J.Super. at 622–28, 625 A.2d at 511–15.

While society has an obligation to prevent child abuse, expert testimony of the kind offered by Ms. Owens–Beckham here must nevertheless be carefully considered before it is acted upon. If the expert is mistaken, a parent's reputation, access to the custody of her children, and even liberty, may be lost over a false accusation. See L. Berliner, *Deciding Whether a Child has been Sexually Abused, in Sexual Abuse Allegations in custody and visitation Cases*, 48 (B. Nicholson & J. Bulkley eds.1988). Thus, we cannot say that the trial court erred in rejecting Ms. Owens–Beckham's testimony. We are buttressed in this opinion by Ms. Owens–Beckham's puzzling refusal to allow the guardian ad litem to review the videotapes of her counseling sessions with the Kahre children.

## II.

■ Greg Kahre claims that the trial court erred in admitting Dr. Sternlof's report into evidence. We disagree.

■ While it might have been preferable for Shawna Kahre to have brought Dr. Sternlof to testify, her counsel told the court

that she could not afford to do so. Dr. Sternlof's report was not controversial. From the record it appears that Dr. Sternlof's report was useful to the trial court, and not misleading. Greg Kahre makes no claim that there was anything prejudicial about Dr. Sternlof's report, beyond the fact that the trial court relied on it. Before any claimed error concerning the admission or exclusion of evidence will be deemed reversible error, an affirmative showing of prejudicial error must be made. *Wall v. Partridge,* 466 P.2d 628 (Okla.1970); *Payne v. McRay Brothers,* 446 P.2d 49 (Okla.1968). "Error may not be predicated upon a ruling which admits or excludes evidence *unless a substantial right of a party is affected."* [Emphasis added.] Oklahoma Evidence Code, 12 O.S. § 2104.A. Further, this was a non-jury case, and the evidence, exclusive of Dr. Sternlof's report, supports the trial court's judgment, so the trial court's decision to admit the report is no ground for reversal. *Phillips v. Thompson,* 389 P.2d 473 (Okla.1964.)

### III.

On March 30, 1995, the trial court held that the second divorce action was a collateral attack on the 1989 divorce decree, which had given custody of the children to Shawna Kahre. We had stayed the 1994 custody decree, on September 26, 1994, but the trial court granted Shawna Kahre custody of the children under the 1989 decree, based on its conclusion that the custody provisions of the 1989 decree were still in effect. On March 31, 1995, Greg Kahre filed an application before this Court to stay the trial court's March 30, 1995 order. We have not ruled on Greg Kahre's application for stay of the March 30, 1995 order.

▇▇▇ The trial court's holding that the custody provisions of the 1989 divorce decree was valid after the parties reconciled was error. "Remarriage of the parents annuls the divorce and restores the parents to their rights over their children as if they had never been divorced." *Jenkins v. Followell,* 262 P.2d 880 (Okla.1953). Only those provisions of a divorce decree relating to *property division* survive remarriage, *Henderson v. Henderson,* 764 P.2d 156 (Okla.1988), those provisions concerning child custody do not. This does not end the inquiry, however. While the trial court erred in holding that the 1989 custody decree survived, although the parties had resumed living together as husband and wife, the trial court's error was harmless.

Our September 26, 1994 order said, "enforcement of the [1994 order] that awarded custody of the parties' minor children to [Shawna Kahre] is hereby stayed pending the appeal herein." Our order did not prohibit the trial court from granting—and enforcing—visitation for Shawna Kahre, nor did it prohibit the trial court from changing custody if conditions changed.

After we entered our September 26, 1994 stay, Greg Kahre deprived Shawna Kahre of visitation rights with the Kahre children that the trial court had ordered. Only after Greg Kahre, and his mother, Jacque Kahre, had repeatedly violated the trial court's orders, including absconding with the children, and DHS had refused to take physical custody of the children, did the trial court enter its March 30, 1995 order placing custody in Shawna Kahre and denying visitation to Greg Kahre. The guardian ad litem fully concurred in the trial court's orders. In other words, both the trial court, and the guardian ad litem, thought that the March 30, 1995 order was in the best interests of the children. There was nothing in our order staying the trial court's permanent custody order prohibiting the trial court from entering interim orders made in the best interests of the Kahre children. After thoroughly reviewing the record in this case, we find that the record supports the trial court's custody and visitation orders. Greg Kahre, however, may seek subsequent modification of the custody and visitation orders, and upon a proper showing the trial court may grant Greg Kahre appropriate relief.

The dissent says that the validity of the trial court's post-stay orders should have been declared "facially devoid of any legal force." The dissent, however, does not say how, or whether, such a declaration should change the result we reach here today. The dissent cites to no cases that would support its position. The only cases cited in the dissent dealing with a trial court's power to change custody orders during an appeal contradict the dissent's thesis. None of those cases deals with the effect of a stay on a trial court's jurisdiction in child custody matters. In fact, the cases cited by the dissent that come most closely to the issue involved here held that trial courts have continuing authority, both before and after judgement, to enter orders in the best interests of the child: *Tisdale v. Wheeler Bros. Grain Co. Inc.*, 599 P.2d 1104, 1107 (Okla.1979) (a trial court may "provide, especially in matrimonial and other equity cases, for temporary adjustment of adjudicated rights pending the final disposition of appeal"); *Jones v. Jones*, 612 P.2d 266, 268–69 (Okla.1980) (any necessary change in custody is deemed ancillary to the appeal and "lies within the concurrent and coordinate cognizance of the district court"); *Cochran v. Rambo*, 484 P.2d 500, 501 (Okla. 1971) (trial court retains jurisdiction to determine temporary custody, although an appeal is pending); *Enyart v. Comfort*, 591 P.2d 709, 710–11 (Okla.1979) (trial court is required to consider motions to modify custody, although an appeal is pending).[5]

■ When a trial court in an equity action attributes an incorrect reason to a decision but reaches the correct result, we will affirm. *Boatright v. Perkins*, 894 P.2d 1091 (Okla.1995). Here, the trial court reached an appropriate result in its March 30, 1995 custody order, albeit for the wrong reason. We

therefore affirm. As we affirm the trial court's original custody order, and its later modifications, Greg Kahre's motion to stay the March 30, 1995 order is moot.

**STAY DISSOLVED, TRIAL COURT'S CUSTODY ORDER, AND SUBSEQUENT ORDERS AFFIRMED**

ALMA WILSON, C.J., KAUGER, V.C.J., and HODGES, LAVENDER, SIMMS, and WATT, JJ., concur.

HARGRAVE and SUMMERS, JJ., concur in part, dissent in part.

OPALA, J., dissents.

SUMMERS, Justice, concurring in part and dissenting in part, with whom OPALA, J., joins.

I do not believe the Court adequately resolves the issue caused by admission of the Sternlof report. The report as admitted was hearsay, it appears to fit none of the exceptions, a timely objection was made specifying the correct grounds, and the report further appears to have been of considerable probative value in the case, raising a likelihood that prejudice occurred.

OPALA, Justice, dissenting.

**I**

**INTRODUCTION**

The court *nullifies* its *early* change-of-custody stay by leaving undisturbed the trial court's *later* mid-appeal modifications with *contravening* provisions. Because—insofar as they affect the *premandate* access-to-the-children regime—*all* the trial court's post-stay orders are clearly *coram non judice*,[1] I

---

5. *Tisdale, Jones,* and *Cochran* are cited in note 6 of the dissent, and *Enyart* is cited in note 7.

1. A case is said to be *coram non judice* when the court in which it is brought *has no jurisdiction to settle the dispute.* BLACK'S LAW DICTIONARY at 305 (5th ed.1979). *See Goldman v. Goldman,* Okl., 883 P.2d 164, 166 (1994); *Board of Law Library Trustees v. State,* Okl., 825 P.2d 1285, 1291 (1991); *Spain v. Kernell,* Okl., 672 P.2d 1162, 1164–1165 (1983); *Bryan v. Seiffert,* 185 Okl. 496, 94 P.2d 526, 531–532 (1939) (the court's syllabus ¶ 6).

must recede from today's tacit approbation of *sheer lawlessness.* I write separately *to expose* the naked nisi prius intrusion into this court's subject-matter cognizance, which lies concealed beneath today's deferential silence. I would reach this critical issue by (1) *analyzing* generally this court's mid-appeal power to suspend the effectiveness of nisi prius decisions *pendente lite,* (2) *explaining* the residue of the trial court's post-stay power to affect the *premandate regime* of parental access to the children, and (3) *concluding* that *in this case* the trial court's mid-appeal incursion into *premandate* custody (and visitation) is facially void.

## II

## THE CRITICAL ANATOMY OF APPELLATE LITIGATION

Upon a vote of 5 to 4,[2] this court *suspended* on September 26, 1994 the mid-appeal *effectiveness* of the trial court's permanent custody award to the mother. *By this act the court froze in the father—for the duration of appellate contest—the control over custody (as well as visitation).*[3] In short, the stay order absolutely *ousts the nisi prius cognizance* over *any issue of pendente lite access* to the children.

*In the face of this unequivocal stay* the trial judge *entered several orders*—all to be effective either immediately or before mandate—*by which he rearranged the parties' rights vis-a-vis their children. Although the father vigorously pressed numerous jurisdictional challenges, the trial court obliviously moved ahead without pausing for a mean-*

ingful probe into its surviving *post-stay cognizance immediately to affect parental access to the children. The litany of nisi prius coram non judice orders includes:*

(1) The February 27, 1995 order directing that the children not be removed from Oklahoma and granting the mother *supervised visitation.*

(2) The March 2, 1995 order once again granting the mother supervised visitation.

(3) The March 7, 1995 order spelling out the mother's visitation rights by directing the father to restrict paternal grandmother's access to the children and vacating a custody order in favor of the Oklahoma Department of Human Services.

(4) The March 30, 1995 order *granting* the mother *custody* and *denying* the *father any visitation rights.*

*All four* of these post-stay, mid-appeal orders are *facially void* for want of subject matter jurisdiction. The absence of the trial court's mid-appeal cognizance to affect *in praesenti* [4] *any* changes in the custodial or visitation regime (effectively *frozen* by this court's stay action) clearly is apparent on the face of the judgment roll.

## III

## THE NATURE OF AN APPELLATE COURT'S POWER TO SUSPEND THE EFFECTIVENESS OF A TRIAL COURT'S DECISION PENDING THE OUTCOME OF REVIEW PROCEEDINGS

Both the trial *and appellate* courts may exercise statutorily conferred discretion to

---

**2.** Concurring in the September 26 stay order were: Hodges, C.J., Opala, Kauger, Summers, Watt, JJ.; voting in dissent were: Lavender, V.C.J., Simms, Hargrave, Wilson, JJ.

**3.** The parties *clearly* and *correctly* understood the broad provisions of this court's stay order to *bar absolutely* all nisi prius attempts at changing custody as well as *visitation rights.* There is pending before us *now* an application to modify

the stay to allow the mother *pendente lite* visitation. *It remains unresolved and ignored* by today's disposition.

**4.** An *in praesenti* judicial act means one that *takes effect immediately.* For example, the grant of an estate in real property is said to be *in praesenti* when it transfers an *immediate* interest in the designated premises. *See Van Wyck v. Knevals,* 106 U.S. 360, 364–65, 1 S.Ct. 336, 337, 27 L.Ed. 201 (1882).

*suspend,* pending appeal, the effectiveness of nisi prius child custody determinations.[5] A halt to the inferior court's mid-appeal enforcement process may be accomplished generally (1) by posting a supersedeas bond [6], where this method is statutorily available, *or* (2) by a quest for discretionary stay. "Supersedeas" differs in our usage from "stay". The former denotes suspension of a judgment's effectiveness *pursuant to an undertaking as a matter of statutory right;* the latter means suspension of the decision's effectiveness *by a discretionary act of a trial or appellate court.*[7] Child custody orders fall under the stay rubric. The impact of an appellate suspension upon the trial court's decision is explained in *In re Epley,*[8] where the court says "[w]hen ... a case has been brought to this court by appeal ... and a supersedeas *or stay* granted by the court ... the trial court is devested [sic] of any jurisdiction in the case pending the determination of the appeal, and it has no power to enforce its judgment or final order...." [Emphasis added.] *Epley, supra* note 7 (the court's syllabus ¶ 5). When the residue of

trial court's cognizance in this case is measured, as it must, by the quoted *Epley* standards, mid-appeal nisi prius orders that afford the mother *premandate* access to her children (by custody, visitation or otherwise) are in *plain contravention* of the father's full custodial control (frozen in him for the duration of the appeal's pendency by this court's September 26 stay) and hence *facially void.* Extant jurisprudence eloquently attests to the continued vitality of the *Epley* boundary line drawn for an orderly *pendente lite* interaction of trial with appellate courts.[9]

## IV

### THE ULTRA–NARROW PARAMETERS OF THE TRIAL COURT'S MID–APPEAL COGNIZANCE

In a matrimonial dispute, a trial court's mid-appeal jurisdiction over parental access to a child generally falls under *two separate rubrics:*[10] (1) Where *pendente lite* custody is tendered as an issue *ancillary* to a pending appeal[11] (this rubric, which deals with custo-

---

**5.** The terms of 12 O.S.Supp.1993 § 990.4(C) provide in pertinent part:
 " * * * The trial *or appellate* court, in its discretion, may stay the enforcement of any provision in a judgment, decree or final order [in a custody proceeding] *during the pendency of the appeal* * * *."* (Emphasis supplied.)

**6.** *See* the provisions of 12 O.S.Supp.1993 § 990.4(A) which govern the posting of a statutory undertaking by which enforcement of certain legislatively-defined classes of judgment may be suspended during an appeal's pendency as a matter of statutory right.

**7.** *Wilks v. Wilks,* Okl., 632 P.2d 759, 763 n. 12 (1981); *1942 Chevrolet Automobile Motor No. BA–193397 v. State,* 191 Okl. 26, 128 P.2d 448, 449 (1942); *State v. Fidelity & Deposit Co. of Maryland,* 179 Okl. 437, 66 P.2d 85, 87 (1937); *Howe v. Farmers' & Merchants' Bank,* 155 Okl. 284, 8 P.2d 665, 667 (1932); *In re Epley,* 10 Okl. 631, 64 P. 18, 20 (1901).

**8.** *Epley, supra* note 7.

**9.** *Wilks, supra* note 7 at 763; *see also Burnett v. Jackson,* 27 Okl. 275, 111 P. 194, 195 (1910); *Herbert v. Wagg,* 27 Okl. 674, 117 P. 209, 211 (1910).

**10.** The terms of 12 O.S.1991 Ch. 15, App. 2 (Rule 1.31) provide in pertinent part:

"(a) For the purposes to be stated the trial court *does retain* jurisdiction in the case after a petition-in-error has been filed in [the Supreme Court].

 * * * * * *

(2) To grant or modify orders in regard to *custody....*

 * * * * * *

(5) *In matrimonial litigation,* to ... issue orders affecting the custody of children ... pending the appeal.

 * * * * * *

(7) To take action with respect to any issue *collateral* to a pending appeal." (Emphasis supplied.)

**11.** *Ancillary jurisdiction* means the trial court's responsibility to entertain requests for relief to be effective *only for the duration of an appellate contest. Tisdale v. Wheeler Bros. Grain Co. Inc.,* Okl., 599 P.2d 1104, 1107 (1979). For an explanation of the trial court's *ancillary* jurisdiction in the context of a matrimonial dispute, *see Jones v. Jones,* Okl., 612 P.2d 266, 267–268 (1980); *Blair v. District Ct. of Okl. Cty.,* Okl., 594 P.2d 367, 369 (1979); *Cochran v. Rambo,* Okl., 484 P.2d 500, 501 (1971).

dy arrangements that are to govern *until* the final outcome of appellate contest, concerns itself with *temporary* orders to be effective *only* for the duration of the review process) and (2) where the nisi prius jurisdiction is invoked to decide an issue *collateral* to a pending appeal [12] (this category includes proceedings in the trial court *not* for *pendente lite* application, but those which seek to *modify* a permanent custody order, then on review, based on an alleged change of conditions occurring *since* that order's original entry).[13]

## A

### THE TRIAL COURT'S ANCILLARY JURISDICTION *EVAPORATED* WITH ENTRY OF THIS COURT'S STAY ORDER

The September 26 stay order *stripped* the trial court of its *ancillary* cognizance over *pendente lite* parental access to the children. That order's unmistakable legal and practical tenor directs that the children remain with the father *for the entire duration* of the appellate contest. In short, this court's stay *supersedes* all *ancillary* power which, absent its issuance, would have continued to reside in the first-instance forum.

## B

### THE TRIAL COURT'S COLLATERAL COGNIZANCE

While nisi prius cognizance over *collateral* issues remained ;maffected by the September 26 stay, it could not be exercised to contravene the fixed *premandate* regime for custody and visitation. In short, *collateral* cognizance will not avail here to justify nisi prius

intrusions into *pendente lite* access to the children.

## C

### CONCLUSION

When tested under both rubrics of mid-appeal cognizance the critical nisi prius orders cannot pass jurisdictional muster insofar as they affect *premandate* access to the children. They flunk the strict teachings of yore.[14]

## V

### SUMMARY

The court closes its eyes to the *overriding impact* of its September 26 stay. It refuses to invalidate a *blatant invasion* of its subject matter cognizance. I would condemn each of the post-stay acts of usurpation as facially void and then dispose of the custody (and visitation) issues raised in this appeal as if none of the jurisdictionally flawed mid-appeal orders was ever in existence.

---

12. For an explanation of the trial court's mid-appeal power over issues *collateral* to the appeal, see *Enyart v. Comfort,* Okl., 591 P.2d 709, 710 (1979); *Herbert, supra* note 9, 117 P. at 211.

13. For the evidentiary elements of a "permanent change of conditions" *see Gibbons v. Gibbons,* Okl., 442 P.2d 482, 485 (1968), where the court states "... [T]he burden of proof is upon the parent asking that custody be changed [to show]

... that, since the making of the order sought to be modified, there has been a *permanent,* substantial and material change of conditions...." (Emphasis supplied.) *Gibbons* at 485.

14. *Hartshorn v. Hartshorn,* 67 Okl. 43, 155 P. 508, 509 (1916); *Kostachek v. Kostachek,* 40 Okl. 744, 124 P. 761, 762 (1912).